## CHARLES L. HOPKINS *vs.* CHUNG WA ET AL.

### ON EXCEPTIONS.

WHERE a husband and wife of pure Hawaiian blood were shown to have been living together for several years before and after the birth of a child by the wife, there being no evidence offered to disprove the non-access of the husband ;

HELD, Austin, J., dissenting, the child was legitimate, and capable of inheriting from the husband as his father ; also,

HELD that evidence of the child's admixture of blood is inadmissable to rebut the presumption of legitimacy.

A lease was made for ten years from the 1st of April, 1858, at an annual rent, payable monthly, with the covenant that the lessee "shall have the privilege, at the expiration of this lease, of renewing the same upon the conditions, provisions, and payments herein specified for another term of ten years, or so long as he or his representatives may desire the same, upon the same condition;"

HELD, after the expiration of the second term of ten years (1st April, 1878), there was a tenancy from year to year which terminated by a notice to quit.

Opinion of the Court by McCULLY, J.

I concur in the conclusions reached by the Chief Justice, and substantially in the expression of his views upon the two points to which exception is taken.   As his decision has been published, it will not be necessary to repeat the matter which has been presented by him with ample learning.   Thise case must rest upon the rules of law declared in the Banbury peerage case, and most fully discussed in the House of Lords' case of Morris *vs.* Davis.   The decision of the Chief Justice having been made a part of the bill of exceptions in this case, I take from it this statement of fact by the Court, viz. : " In the case before me there was no attempt to show non-access of the husband.   The evidence of an intimate acquaintance of the family is to the effect that, during the period covered by a year or more previous to the birth of plaintiff, Kaiawa and his wife lived together up stairs in a house in which Hopkins, senior, lived."   Upon this statement, it appears to me that by the third answer in the Banbury peerage case no other evidence is admissible to show that another person than the said husband was the father of the wife's offspring.   If this rule be abandoned in the case of such facts as above stated, I am unable to rest upon any other definite rule for the determination of legitimacy.   If we once admit evidence to show that while a wife cohabits with her husband, he not being shown to be incapable of begetting offspring, another man also shares her bed, and her offspring are to be assigned to the one or the other as they may appear from the complexion and other resemblances to belong to either, we shall find ourselves called upon to disturb the security of descents upon every suspicion of unfaithfulness, which, after a long time, may be offered in proof.

There is a special propriety in applying the rule in the case before us—where the question is of the legitimacy of the offspring of a Hawaiian woman, as the ancient Hawaiian rule was to regard chiefly the mother in questions of descent,

for it could always be certainly determined who was the mother.

In respect to the term of the lease, I hold that the privilege of " another term of ten years, or so long as he or his representatives may desire the same,". gave the lessee nothing more, at the most, than a second term of ten years, and that this having expired he holds by a tenancy terminable by a sufficient notice to quit, and that the notice herein is sufficient.

March 21, 1883.

----

I adhere to the opinion rendered by me February 6, 1883.

A. FRANCIS JUDD,

Chief Justice Supreme Court.

March 21, 1883.

----

DISSENTING OPINION BY AUSTIN, J.

In this case the testimony substantially shows that the plaintiff's mother and her lawful husband were natives ; that for a year or more immediately prior to the plaintiff's birth they lived together as husband and wife up stairs in a house in which lived Charles Gordon Hopkins, a white man. That the plaintiff at his birth was named Charles L. Hopkins, and was brought up as the son of Charles Gordon Hopkins, and was treated as such by him and by his mother and her said husband ; and his appearance strongly shows an admixture of white and native blood.

By these facts I think that the presumption of legitimacy is countervailed. I do not think that the rule in the Banbury peerage case should be applied in this case, and I respectfully dissent from the opinion of the majority of the Court that the plaintiff is legitimate.

Upon the other points in the case I concur with my associates.

Honolulu, March 22, A.D. 1883.

Charles L. Hopkins *v.* Chung Wa *et al.*

OPINION OF JUDD, C. J. (THE JURY BEING WAIVED), TO WHICH
THE EXCEPTIONS WERE TAKEN.

The plaintiff seeks by this action to recover possession of the land on the north-east corner of Nuuanu and King streets, Honolulu, which he claims by right of inheritance as surviving heir of Mainae, w., to whom the same was granted by Royal Patent No. 1,744.

The defendants hold by a lease from the heirs of James Austin, who obtained possession of the premises by virtue of an instrument hereafter to be considered from the said Mainae, patentee, to himself, dated the 24th of January, 1854.

The plaintiff claims as the nephew of Mainae, and avers that he is the son of Kaiawa, k., and Kahanu, w., Kaiawa being the brother of Mainae.

It is proved to my satisfaction that Mainae had a husband, Kekoko, who died many years ago leaving no issue. Mainae married again, one Luau, and died in 1877, leaving no issue, their children dying in the lifetime of the parents. Luau thereafter married Kahiki, and died since this action was brought.

Kaiawa married Kahanu about the year 1838, as some witnesses say, others say later. Kahanu died in 1868, and Kaiawa in 1878. All these parties are native Hawaiians of unmixed blood. The plaintiff was born at Kaaawa, Koolaupoko, Oahu, in the year 1853, of the woman Kahanu, who is also known as Waakauhonua. Her husband Kaiawa is proved not only to have been married to her, but to have consorted with her as her husband for many years previous to and subsequent to the birth of the plaintiff. It is also proven that this couple were servants of an Englishman, Charles Gordon Hopkins, sen., living in the same house with him in Honolulu, and that the plaintiff received his name from him, was supported and considered by him as his son, which is strongly supported by the plaintiff's personal appearance as to complexion and physiognomy.

A. S. Hartwell, for defendants, urges that the Court on these facts is compelled to find that the plaintiff is illegitimate, and not entitled to inherit from Mainae, his alleged father Kaiawa's sister, relying upon the following:

"The presumption of legitimacy may be rebutted by circumstances inducing a contrary presumption." 2 Selwyn, N. P., 758.

"Where the husband in the course of nature cannot have been the father of the wife's child, the child is by law a bastard, whether the husband be within reach of access or not." *1b.*

All the remarks in Selwyn show that the evidence may show that the husband could not by the laws of nature have been the father.

"A child born during lawful matrimony is presumed legitimate. This may be disproved by circumstances, as showing the husband to be under the age of puberty, or laboring under some other natural disability, or his continued absence or other circumstances repelling strongly the presumption of access." 2 C. J. Hill's Notes, 405. See 1 Phil. Ev., 158.

"As a general rule, the presumption (of legitimacy) may be rebutted by evidence." Tyler on Ejectment, p. 493, citing Morris *vs.* Davis, 5 Cl. and Fin.; and Reg. *vs.* Mansfield, 41; C. L., 618.

"The doctrine, however, is clearly settled, that although the birth of a child during wedlock raises a presumption that such child is legitimate, yet this presumption may be rebutted both by direct and presumptive evidence; and in arriving at a conclusion on the subject, the jury may not only take into their consideration proofs tending to show the physical impossibility of the child born in wedlock being legitimate, but they may decide the question of paternity by attending to the relative situations of the parties, their habits of life, the evidence of conducts and of declarations connected with conduct, and to any induction which reason suggests for deter-

mining upon the probabilities of the case." *Ib.*, 561, citing 4 Term, 356; 2 Str., 924; Co. Lit., 123 b.

"It is an irresistible inference from all the facts that the plaintiff is the son of Hopkins, sen. As a matter of fact a half white child of native parents is a natural impossibility. The law allow such a finding of facts to be made on reasonable evidence, and if such fact is proved it rebuts the presumption of legitimacy."

PER CURIAM.

The leading case on this subject is Morris *vs.* Davis, 5 Clark J. Finnelly, 163, 369 (1836). Lord Cottenham was Chancellor, and the eminent jurists Lords Lyndhurst and Brougham sat in the case.

It became necessary for their Lordships to review the Banbury peerage case. In this last-named case certain questions were sent to the Judges of England, the answers to which are summarized by Lord Lyndhurst in Morris *vs.* Davis, as follows :

"1. That when husband and wife have opportunities of access, the presumption of legitimacy may be rebutted by circumstances inducing a contrary presumption.

"2. That non-access, or non-generating access, may be proved by means of such legal evidence as is admissable in every other case in which it is necessary to prove a physical fact.

"3. That, after proof of sexual intercourse, evidence will not be admitted, except to disprove the fact.

"4. That sexual intercourse is presumed unless met by such evidence as satisfies those who are to decide that it did not take place."

The full answer to the fourth question is as follows : "That in every case where a child is born in lawful wedlock, the husband not being separated from his wife by sentence of divorce, sexual intercourse is presumed to have taken place between the husband and wife ; until that presumption is

encountered by such evidence as proves to the satisfaction of those who are to decide, the question that such sexual intercourse did not take place at any time when, by such intercourse, the husband could according to the law of nature be the father of such child."

The House of Lords, in the Morris *vs.* Davis case, found as follows—(I copy the head note) : " Husband and wife, after living together for ten years, and having one child, agree to separate. They accordingly afterwards lived apart, but within such distance as afforded them opportunities of sexual intercourse, the husband not being impotent,

" Held, that the presumption of law in favor of the legitimacy of a child begotten and born of the wife during the separation, may be rebutted, not only by evidence to show that the husband had not sextual intercourse with her, but also by evidence of their conduct, such as that the wife was living in adultery, that she concealed the birth of the child from the husband, and declared to him that she never had such child; that the husband disclaimed all knowledge of the child and acted up to his death, as if no such was in existence; and also, that the wife's paramour aided in concealing the child, reared and educated it as his own, and left it all his property by will."

In the case before me there was no attempt to show nonaccess of the husband. The evidence of an intimate acquaintance of the family is to the effect, that during the period covered by a year or more previous to the birth of the plaintiff, Kaiawa and his wife lived together upstairs in a house in which Hopkins, senior, lived.

Here, then, not only had the husband and wife opportunities of access from which sexual intercourse is presumed to have taken place ; but there is no evidence even tending to encounter the presumption of such intercourse. For the evidence of the acts of Hopkins, senior, in relation to the child, as well as the appearance of the child, do not tend to disprove

Charles L. Hopkins *v.* Chung Wa *et al.*

the presumption of sexual intercourse of the husband and wife ; they are even quite consistent with it. These facts do tend very strongly to show that Hopkins, senior, had sexual intercourse with the mother; but it is the policy of the law not to encourage the admission of evidence of this character, and in order to protect the marriage relation, the presumption in favor of legitimacy must be sustained in a case like this— according to the third answer of the Judges above cited from the Banbury peerage case, that " after proof of sexual intercourse (of the husband and wife) evidence will not be admitted, except to disprove the fact.''

I can find no case at all approaching the view urged by defendant's counsel. The apparent mixture of blood in the plaintiff is a feature in this case which does not appear in any of the cases I have been able to find. But I do not think this is sufficient to rebut the presumption of legitimacy, the plaintiff having been born in lawful wedlock while the husband and wife were living together, and no approach made towards showing that sexual intercourse between husband and wife did not take place at any time when, by such intercourse, the husband could according to the law of nature be the father of such child.

To go beyond the adjudged cases would promote inquiries into domestic affairs which would be subversive of the sanctity of the marriage relation, and create public scandal.

To summarize this point; I hold that, notwithstanding the physical fact of the plaintiff having an admixture of white and native blood, the fact that is also shown by uncontradicted evidence that his mother and her husband were having actual intercourse with each other at all times renders the evidence of the plaintiff's admixture of blood inadmissible in law, so that the presumption of his legitimacy is not thereby removed, and he is thereby entitled to inherit from Mainae, the patentee of this land.

I pass now to the defense. An instrument is introduced, entitled " An Indenture of Lease," bearing date the 24th

January, 1854, between Mainae of the first part, and James Austin of the second part, by which the party of the first part, in consideration of one dollar, and for the further consideration of the conditions and obligations hereinafter specified and set forth hath granted, and, by lease, let unto the said James Austin, his heirs, representatives, and assigns for the term of ten years from and after the 30th day of March, 1858," * * * the premises in dispute, describing them by metes and bounds: "To have and to hold the above-described lot, with all the buildings thereon, and all appurtenances thereunto belonging unto the said James Austin, his heirs, representatives, and assigns for the full term of ten years from and after the 30th day of March, A.D. 1858, as aforesaid, without molestation or hindrance from the said Mainae, or any other person whomsoever claiming by, through, or under the said Mainae."

"And the said James Austin covenants and agrees to, and with the said Mainae, that he the said party of the second part or his representatives or assigns will pay or cause to be paid to the said party of the first part, or her representatives as a rent for the above described premises annually, the sum of $250 in equal monthly payments, beginning in April, 1858, and continuing for the full term of ten years thereafter, he the said party of the second part agreeing to and with the party of the first part to pay any taxes that may be by law imposed on the said premises during the continuance of said term. And it is further agreed and fully understood by the parties, that the said party of the second part shall have the privilege at the expiration of this lease, of renewing the same upon the conditions, provisions and payments as herein specified, for another term of ten years, or so long as he or his representatives may desire the same upon said condition. And said James Austin or his representatives or assigns, shall occupy and enjoy the lot of ground and premises herein conveyed without opposition or disturbance for the said term of

Charles L. Hopkins *v.* Chung Wa *et al.*

ten years, with all privileges and immunities incident to abso-
lute ownership, he paying for the same as aforesaid the yearly
sum of two hundred and forty dollars in equal monthly instal-
ments, beginning with April, 1858, as aforesaid-'' (Then
follows a provision for distraint for rent in arrear).

"And it is also agreed by the said parties that, at the ex-
piration of this lease, the said lot of ground shall be restored
to the said Mainae or her representatives, together with all
the buildings and improvements." This lease is signed by
Mainae and James Austin, their signatures acknowledged,
and the instrument recorded 28th January, 1854.

On the back is the following : "Know all men by these
presents that I, Luau, of Honolulu, in the Island of Oahu, do
hereby declare that I have always known, approved, and
consented to the within instrument, and do hereby, as far as
my rights are concerned, ratify and approve the within in-
strument this 15th day of September, A.D. 1880.

his<br>" Luau.   X<br>mark.

"In presence of H. L. Sheldon."

Luau's acknowledgement to the above was taken 23rd
January, 1882.

It is claimed by plaintiff's counsel that this instrument,
being made by a married woman, is void *ab initio ;* that, it
being void, it cannot be revived by the husband after the
death of the wife, for the property descended to her heirs on
her death.

The defendant's counsel, on the other hand, contends that
the instrument in question is not void because it was executed
by a married woman, as her husband expressly ratified it.

The law in force in respect to a married woman's control of
her lands in 1854, when this instrument was made, was the
same as at present.

"The wife shall be deemed, for all civil purposes, to be
merged in her husband, and civilly dead. She shall not,

without his consent,   *   *   *   have legal power to make contracts, or to alienate and dispose of property." Laws of 1846, p. 59 ; and Civil Code, Section 1,287.

Various Justices of this Court have held that a deed of a married woman, her husband not joining or assenting thereto, is void. But the paper in this case is in the nature of a lease upon which the husband has endorsed his express consent and ratification.

I see nothing in the statute to indicate that the husband's ratification or consent must be contemporaneous with his wife's contract. The meaning is clear that she may make contracts, and alienate or dispose of her property with her husband's consent.

The common law method by which a wife could alienate her land was by fine and recovery by matter of record in open Court.

Chancellor Kent, in his Commentaries, Second Book, p. 153, says : "The substitute of a deed for a conveyance by fine has prevailed throughout the United States as the more simple, cheap, and convenient mode of conveyance. The reason why the husband was required to join with his wife in the conveyance was, that his assent might appear upon the face of it, and to show that he was present to protect her from imposition," etc. There is some evidence that Luau, the husband of Mainae, sometimes received the rent during her lifetime, but I find no receipt of such a date.

Having found that the instrument under which defendants hold possession is not void, I now consider its purport. It creates a valid tenancy in James Austin for the first ten years, from 1st of April, 1858, to 1st of April, 1868, and his holding over as a tenant and continuing to pay the rent, on the authority of Campbell and Turton *vs.* Akana, 3 Haw. Rep., 571, bound him for a full term of ten years more, under the clause for renewal. This additional term expired 1st of April, 1878. But the instrument gives the party of the second part the

privilege of renewing for another term of ten years, or "so long as he or his representatives may desire the same upon said conditions."

This is claimed by the defendants' counsel "to create a fee, determinable at the pleasure of the grantee, or a base fee. If a base fee was not created, the instrument is a lease providing for extensions of terms of ten years, each new term beginning by actual occupancy, and holding over from the previous terms. Defendants' counsel cited cases which are referred to in the opinion of the Court."

In 1 Washburn R. P., p. 62, we read, "the term determinable fee seems to be more generic in its meaning, embracing all fees which are liable to be determined by some act or event expressed on their limitation to circumscribe their continuance, or inferred by law as bounding their extent."

Plowden uses the following language: "Such perpetuity of an estate which may continue forever, though at the same time there is a contingency which, when it happens, will determine the estate, which contingency cannot properly be termed a condition, but a limitation, may be termed a fee simple determinable."

Although in the instrument the "heirs" twice occurs in the demising clause, and in the habendum clause, there is a clause that the premises shall at the expiration of the lease be restored to the said Mainae, or her representatives with all the buildings and improvements, which would be inconsistent with the idea of creating a fee of any character in the land. It seems to me also, that by the event or act which is to determine the estate in a base fee is meant something different than the mere election of the grantee, or his wish to terminate the estate. I cannot reconcile the definitions above given with the language of the instrument before me. Looking at the whole instrument I am of the opinion, that no estate in fee was intended by the parties, but a leasehold estate.

Counsel for plaintiff contend, that after the 1st of April, 1878, there was a tenancy at will between the parties, and which would be terminated by the death of either party.

Taylor's Landlord and Tenant, Section 333, says, "a covenant to let the premises to the lessee at the expiration of the term, without mentioning any price for which they are to be let; or to renew, upon such terms as may be agreed on, in neither case amounts to a covenant for renewal, but is altogether void for uncertainty. Nor will a general covenant for renewal be construed to imply a perpetual renewal unless the words are expressly to that effect; the most a lessor is bound to give on such a covenant is, to renew for one term only. Covenants for continued renewals are not favored, as they tend to create a perpetuity."

In the opinion of Van Ness, J., in Abeel *vs.* Radcliff, 13 Johnson, 299, where the lease contained a covenant "to let the lot" at the expiration of the term created, the judge said: "The word let is strictly applicable to a lease and not to a deed in fee; and a lease is for life or for years, or at will, and always for a less time than the interest of the lessor in the premises." The Judge held that the covenant was totally void for uncertainty.

A late case, W. Transp. Co. of Buffalo *vs.* Lansing, 49 N. Y., 499, 1872, is very instructive. The lease was for fifteen years with a clause, "with privilege of keeping and occupying said lots for such further time after the expiration of said term as said party of the second part shall choose or elect, yielding and paying therefore the same rent, etc."

This high Court per Folger, J., held that where before the expiration of the specified term, the lessor dies, the lessee is is not entitled to a renewal or extension of the lease.

On page 505 the Judge says, "and so it is said, that if one let lands for such a term as both parties shall please, this is but a lease at will; because what that term will be is utterly uncertain. (Bacon's Ab. Lease L. B.) That is, as I under-

stand the proposition, that it is at the time of the lease utterly uncertain what term the parties will please, and not that they may never please to fix upon a certain term. For the certainty of the continuance of the term ought to be ascertained, either by the express limitation of the parties at the time the lease was made or by reference to some collateral fact which may with equa' certainty measure the continuance thereof otherwise it would be void.''

"Now it is plain that there is nothing in the instrument before us which specifies and makes certain the term for which the new lease was to be given, or for which the lessee was to enjoy a further occupation after the first lease had expired. Nor is there any reference to any writing then in being, nor to any collateral fact or circumstances then existing which made it certain.''

Also, from page 508 : "He is not by it, before, or when he begins that occupation, to name and specify the number of years for which he will continue as tenant. But the occupation is to run along without a determined continuance specified beforehand ; and is, for its duration, dependant all the while upon his choice or election, unexpressed as to a definite term thereof, so that it may continue indefinitely, and be arrested whenever he wills. * * * It is at most a tenancy from year to year, so long as both parties please, for the Courts do not willingly construe demises where no certain term is mentioned, to be tenances at will, and incline to hold them to be from year to year—especially where an annual rent is reserved.

" Moreover, when certainty of continuance depends upon matter *ex post facto*, that matter must occur in the lifetime of both the lessor and lessee, because no interest passes out of the lessor during his lifetime, and, after his death, the naming of years will be too late. In my judgment the most that the lease created, by the provisions under notice, was a tenancy from year to year, determinable at the will of either party upon giving the requisite notice.''

Charles L. Hopkins *v.* Chung Wa *et al.*

This · case is almost exactly parallel with the one under consideration, and is convincing. I am aware that there are cases where the contrary is held—especially Sweetzer *vs.* McKenney, 65 ; Maine, 225. In this case the lease was for five years, "and as much longer as he desires;" and the Court says : "We feel bound to give effect to the written agreement of the parties according to its tenor and intent. The stipulation that he was to have the rooms as much longer as he desires was part of the consideration for which he took a lease, and paid the $50, annual rent for five years."

The case differs from the N. Y. case in the respect that both parties to the lease were alive.

Being at liberty so to do, I adopt the principle of the N. Y. decision, and hold that the lease under which the defendants hold, by its terms now creates a tenancy from year to year which by the notice to quit of the 3d of March, 1882, terminated on the 31st of March, 1882, when the year expired.

As the plaintiff has shown that Mainae left a husband Luau, surviving her, he or his heirs would be entitled to one undivided half of this estate, and therefore judgment must be entered for plaintiff for one undivided half of the premises mentioned in the complaint.

W. R. Castle for plaintiff.

A. S. Hartwell for defendant.

Honolulu, February 6, 1883.