## HELEN KAWAILANI McMILLAN *v.* EMIL C. PETERS AND ROBERT W. SHINGLE, TRUSTEES UNDER THE WILL OF CHARLES NOTLEY, DECEASED, ET AL.

### No. 1823.

ARGUED JUNE 5, 1928.          DECIDED OCTOBER 3, 1928.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY BANKS, J.

This is a suit in equity brought by the complainant, in which she seeks to have herself decreed to be the owner and entitled to the immediate possession of a certain proportion of the accrued income derived from property devised in trust by one Charles Notley, now deceased. The circuit judge before whom the issues were tried entered a decree granting the complainant the relief

prayed for. The respondents bring the case here on appeal.

The uncontradicted evidence discloses that Charles Notley, on the 18th day of May, 1899, executed his last will and testament in which, after making certain specific bequests which are not involved in this suit, he devised all the rest and residue of his property to Thomas Rain Walker and Anthony Lidgate, to be held by them in trust for the uses and purposes set forth in the will. Later the testator executed two codicils, but inasmuch as they do not affect the questions now before us they will not be further mentioned. By due and regular succession the respondents, Emil C. Peters and Robert W. Shingle, are now the trustees of the will, charged with the duty of executing its terms and provisions.

The portions of the will creating the trust and prescribing its terms and conditions are as follows: "Sixth. All the rest, residue and remainder of my estate, real, personal or mixed, and wherever situate, I give, devise and bequeath unto the said Thomas Rain Walker and Anthony Lidgate, in trust nevertheless for the uses and purposes herein set forth, that is to say: to pay the rents, issues and profits arising from and out of my said estate in manner following: *One-sixth* thereof to my wife Mary K. Notley during the term of her natural life, such payment to be in lieu of her dower right in my estate, and from and after the death of my said wife, the said one-sixth share or part of said income shall be divided among the surviving devisees named in this my will in the shares and proportions hereinafter set forth and limited to each of them. *One-sixth* thereof to my son William during the term of his natural life, and from and after the death of my said son William, then to Melisa, the wife of said William, during the term of her natural life; and from and after the death of the said

Melisa, the said one-sixth share or part of said income shall be divided among the surviving devisees share and share alike. *One-sixth* thereof unto the children of my son Charles Notley, Jr. named, John, Victoria Maria, Lilly and William, share and share alike. And I hereby direct my said trustees not to pay any of said share of the said income unto any of the above named children of my said son Charles Notley, Jr. until such time as each of them, being males, shall arrive at the age of twenty-one years, and being females, shall arrive at the age of eighteen years; and that in the meantime and until the happening of such event as to each of said children, I direct my said trustees to keep said one-sixth share of said income invested in such securities as they or their successors may think proper, and the income, rents, issues or profits thereof shall be divided equally among said children upon the arrival of them at the age of twenty-one and eighteen years respectively as hereinbefore limited. And in the event of the death of any of said children before the arriving at the ages aforesaid, or in the event of their death after the arrival at the ages aforesaid, the heirs of such children shall take the share of the child so dying. *One-sixth* thereof unto my daughter Maria, the wife of Thomas Hughes, during the term of her natural life, free from all control or liability of the marital rights of any husband. *One-sixth* thereof to my son David Fyfe Notley during the term of his natural life; and *one-sixth* thereof to my niece Emma Danford, nee Mullinger, during the term of her natural life, free from all control or liability of the marital rights of any husband. And from and after the death of all of my said children and my said niece Emma Danford, nee Mullinger, I hereby direct my said trustees or their successors to convey all of my estate among the heirs at law of my said children William, Maria, David

Fyfe, and my said niece Emma Danford, nee Mullinger, and the children of my said son Charles Notley, Jr., namely: John, Victoria Maria, Lilly and William, share and share alike. And I direct, that until the death of all the legatees last named, the income accruing from said trust estate, shall, until such event happen, be paid among the heirs at law of all such as may have died before the death of the survivor of said last named legatees. In the event of the death, resignation or any disability of my said trustees or either of them, I hereby direct the court having jurisdiction of probate matters and wherein my will is probated to appoint a new trustee or trustees as the case may be. I hereby authorize and empower my said trustees or their successors to make such changes and alterations in the nature and kind of investments of my estate and vary the same in such manner as in their discretion will result to the best advantage of said estate, and also to use, handle, control, invest and reinvest all property belonging to said estate in such manner as to them shall seem proper for the best interest of those interested in said estate."

All the legatees last named in the will are not yet dead and therefore under its terms the corpus of the estate is not presently distributable. The income, however, is distributable among those entitled to receive it. David Fyfe Notley, a son of the testator and one of the legatees, died intestate on or about the 25th day of September, 1922, and according to the provisions of the will his heir or heirs at law, as the case may be, are entitled to the share of the income to which David Fyfe Notley would have been entitled had he survived. The complainant herein claims that she is the sole heir at law of David Fyfe Notley and is therefore entitled to this share of the income. Her claim is based on the assertion that she is the legitimate child of David Fyfe Notley

and her mother, Kamalu Notley, that her mother is now dead and that the other two children born to David and Kamalu died without issue. She concedes that she was born out of wedlock, that is, that at the time of her birth David and Kamalu were not legally married. She also concedes that at the time of her conception and birth Kamalu was legally married to one Keahialoa Kahiamoe (hereafter referred to as Keahi) and that said Keahi was then living. But she claims that at the time of her conception and birth Kamalu and Keahi were living separate and apart and that she was begotten by David and that subsequent to her birth Kamalu and Keahi were divorced and that thereafter David and Kamalu were lawfully married, which marriage she claims, under the law of this Territory, made her the legitimate child of David. The divorce of Kamalu from Keahi and her subsequent marriage to David were conclusively proven by record evidence. It is not denied by the respondents that if David was in fact the father of the complainant his subsequent marriage to Kamalu legitimized her and entitled her to the relief which was granted her. They strenuously deny, however, that there is sufficient competent evidence before the court to justify the conclusions reached by the circuit judge.

It is contended by the respondents that under the facts above narrated the burden is upon the complainant to prove, first, that Keahi was not her father, and, second, that David Fyfe Notley was. Both of these contentions are sound. When a child is born during the existence of a valid marriage the presumption is that it was begotten by the husband. Under certain conditions this presumption is one of law and therefore irrebuttable. Under others it is one of fact and therefore rebuttable.

That cases may arise in which the presumption of the

legitimacy of a child conceived at a time when its mother had a lawful husband living may be overcome by competent testimony is clearly recognized by section 3043, R. L. 1925, and the amendment thereto. The section as amended is as follows: "Section 1. Section 3043 of the Revised Laws of Hawaii 1925, is hereby amended to read as follows: 'Section 3043. Bastards; legitimation. All children born out of wedlock, irrespective of the marriage of either parent to another, become legitimate on the marriage of the parents with each other and are entitled to the same rights as those born in wedlock and shall take their father's name as a family name, and a Christian name suitable to their sex. Such child or children or the parents thereof may petition the registrar general of vital statistics to have the birth record amended to make such birth legitimate and to insert therein the name of the father, and the registrar general is hereby directed to make such amendments upon being satisfied that such child or children has or have been legitimated.'" L. 1927, Act 17. If it had not been the intention of the legislature that inquiry might be made into the legitimacy of a child conceived while the mother had a lawful husband living it would not have authorized the legitimation of children born out of wedlock (that is, as the result of unlawful intercourse) irrespective of whether the mother or the actual father was married to another person. The legislative will on this subject is also indicated by section 2984, R. L. 1925, which is as follows: "A divorce for the cause of adultery committed by the wife shall not affect the legitimacy of the issue of the marriage, but the legitimacy of such children, if questioned, shall be tried and determined by the judge. In every such case the legitimacy of such children shall be presumed, until the contrary be shown." The legislature has thus indicated that, certainly in some in-

stances, the presumption of the legitimacy of offspring, arising from the mere marriage of the mother at the time of conception, may be rebutted.

The evidence in the instant case is without material conflict, that subsequent to their marriage and long before the complainant was conceived Kamalu and Keahi disagreed and separated and never again habitually lived together. Keahi seems to have taken up with another woman, with whom he lived informally, and Kamalu cohabited with another man, by whom she gave birth, prior to the birth of complainant, to an illegitimate child. Although they both lived in or around Honolulu and had what is technically termed "access" to each other there was no proof of actual sexual intercourse between Keahi and Kamalu after their separation. Under these facts we think the rule that the presumption of legitimacy may be rebutted should be applied.

It is contended by the respondents, however, that there is evidence, which should be believed, that Keahi lived in the house with Kamalu at a time, during their marriage, when complainant must have been begotten and that from this fact there arises such a strong inference that he had sexual intercourse with Kamalu that he is conclusively presumed to be the father of complainant. Let us examine the testimony upon which this claim is based. If it does not establish the fact from which the presumption could only arise the presumption itself does not exist and need not be further considered. In his written decision the circuit judge said regarding this phase of the case: "There is some evidence indicating that Keahi still lived somewhere in Honolulu, part of the time in the city proper and part of the time on the windward side of the island. There is no evidence to indicate just where he was during the year prior to the birth of petitioner. There is no evi-

dence to show that Keahi actually did cohabit with petitioner's mother during the year prior to petitioner's birth. There is some evidence which this court regards as very weak and inconclusive, that Keahi was occasionally seen in and about the places where Kamalu the mother lived, at some uncertain time at or about the time that Makaiwi" (an illegitimate child of Kamalu's) "was born, prior to the time that petitioner was begotten." The testimony which the circuit judge had in mind tends to show that at sometime prior to the birth of the complainant Kamalu, her mother, lived in Nuuanu Valley at a place called Puiwa and that Keahi, her husband, was seen at the house where she lived and sometimes slept in the house. Whether Kamalu was living at Puiwa in 1893, when the complainant must have been conceived, or whether Keahi was there at or about that time it is impossible to determine with any degree of accuracy from the testimony. All the witnesses who testified on this point were aged Hawaiians who had little or no recollection of dates. None of them was able to give even the year when Kamalu lived at Puiwa or the year when Keahi was seen there. One of them first testified that Kamalu left Puiwa about six months after the Monarchy was overthrown, which, as we judicially know, was in January, 1893. Later she testified that Kamalu finally left Puiwa a few months after the death of King Kalakaua, which, as we judicially know, occurred in January, 1891. She also testified that the overthrow of the Monarchy was prior to the Wilcox revolution at the palace, which, as we judicially know, was in 1889. We are not surprised that the circuit judge found it impossible to decide that Keahi was actually with Kamalu at or about the time the complainant was conceived. We find the same difficulty. Our conclusion is that the testimony relied on by the respondents fails

to establish the fact upon which the conclusive presumption of complainant's legitimacy would necessarily be obliged to rest and that there is no foundation for the presumption.

We will next consider the presumption of Keahi's paternity arising out of his marriage to Kamalu and their residence in the same community at or about the time when the complainant was conceived. As we have already observed, this is a presumption of fact merely and is susceptible of being overcome by sufficient and competent evidence. Some of the facts which tend to overcome the presumption of Keahi's paternity are undisputed. For instance, Keahi and Kamalu were married on July 2, 1880. After a year or two of cohabitation they separated and went their several ways and never again had a home together nor otherwise treated each other as married people usually do. Kamalu became a hula dancer and lived on terms of intimacy with Makaiwi, by whom she bore a child which later was taken in custody by its father. The preponderance of evidence shows that David Fyfe Notley and Kamalu became acquainted sometime prior to the year 1893 and began cohabiting as man and wife first at Kakaako, a district in Honolulu. From Kakaako they moved to other localities. When the complainant was born on February 22, 1894, they were living at the house of a man named Kaia, who resided at Kalihi. From the inception of their cohabitation they never separated. They went together from place to place and lived together openly. There is nothing in the evidence from which the inference can be drawn that Kamalu, during all this time, lived with or had intimate relations with any other man or that David had intimate relations with any other woman. There is no evidence that Keahi was seen with Kamalu during the time she and David lived together

or was known to be around any of the places where they lived. There is no evidence that Keahi, after the birth of complainant, did or said anything which indicated that he considered himself her father. We think the mere presumption that the complainant was begotten by Keahi should not prevail against this evidence. Since Keahi and Kamalu were married and both were living in Honolulu at the time of complainant's conception it would be impossible to prove with absolute certainty that he did not have sexual relations with her during that period. The law requires no such impossibility. What the law does require is that the presumption of legitimacy arising from marriage and "access" be overcome by facts and circumstances that are sufficiently strong to be convincing that the contrary is true. In the opinion of the circuit judge this requirement was met and likewise in our opinion it was met.

Finally, Did the complainant sustain the burden of proving that David Fyfe Notley was her father? On this point the circuit judge, against respondents' objection, admitted declarations made by David during his life recognizing his paternity of the complainant. It is contended that this evidence was improperly admitted and should not have been considered by the circuit judge and should not be considered here. The reason urged against its admissibility is that it being conceded that the complainant was born during the marriage of her mother to Keahi it is against the policy of the law to permit her legitimacy to be questioned by the man who was at the time living in adultery with her mother and to whom the paternity of the child is sought to be attributed. It has been many times held by courts of high authority that when the fact, if proven, that a child was the product of adulterous relations between the mother and her paramour would inevitably result in the

child's illegitimacy, neither the mother, her husband nor her paramour is competent to testify against the child's legitimacy. One reason for this rule is that it would be a gross injustice to the child to permit those who were so intimately related to its conception to impugn its legitimacy and thus place upon it the stigma of bastardy. That reason does not exist in the case before us. In no event can the complainant be a bastard. If Keahi was her father she is legitimate because at the time of her conception he was her mother's lawful husband. If David Fyfe Notley was her father she was made legitimate under the provisions of section 3043, R. L. 1925, by his subsequent marriage to her mother. See *McMillan* v. *Gleason*, 29 Haw. 258, and *Notley* v. *McMillan*, 16 Fed. (2d) 273.

Under these circumstances there is no reason for applying the rule invoked by the respondents and therefore it should not be applied. We think the declarations made by David were properly received in evidence. Many of these declarations tend very strongly to show that he believed himself to be the complainant's father. He was present when she was born and then and there stated in the presence of others, "Oh, I am glad I have a child." Subsequently, on divers occasions up to the time of his death, he stated to many people that she was his child. He declared it in private conversations with his friends and relatives and he declared it publicly at an Hawaiian feast given in her honor. He declared it in most affectionate terms to the complainant herself in his correspondence with her during her absences from Honolulu. He was present when she received the holy ordinance of baptism and informed the elder who officiated that her name was Helen Kawailani Notley. He at all times bestowed upon her the care and affection that a father only bestows upon a child begotten by him.

All this is powerful proof that he believed her to be his child. This he could not have believed unless he knew that he was having sexual intercourse with her mother at or about the time she must have been conceived. He lived with the mother continuously from the date of the complainant's birth on February 22, 1894, up to his death, and finally married her in the year 1900, thus legitimizing complainant if he was in fact her father. It is unlikely that, even with his unconventional standards of morality, he would have taken this course unless he believed the child was his. David's declarations and conduct tending to show his paternity do not, however, stand alone and unsupported. There was corroborative testimony. This testimony points toward sexual intimacy between Kamalu and David prior to, at or about the time of, and subsequent to the period when the complainant must have been conceived. There is no dispute that she was born on February 22, 1894. There is no suggestion that her birth was premature. The normal time between conception and birth being nine months, she must have been conceived on or about May 22, 1893.

As we have already pointed out, there was testimony (other than the declarations and conduct of David) which tends strongly to show that David and Kamalu began their cohabitation, living together as man and wife, sometime prior to 1893, and that they continued to so live and were thus living when the complainant was born. If this testimony is believable (and it was found to be so by the circuit judge who had the witnesses before him) and is unrebutted by other testimony which destroys its force and effect it is sufficient, when taken in connection with the declarations and conduct of David, to establish the complainant's contention that David was her father.

It is contended by the respondents that they intro-

duced witnesses whose testimony shows conclusively that. David was not in Honolulu but in the district of Hamakua on the Island of Hawaii when the complainant was begotten and that this testimony entirely destroys her case. In commenting on the testimony of those witnesses the circuit judge said in his written decision: "There was also an attempt to show the presence of David. Notley on the Island of Hawaii at a time which would have made it impossible to have been the actual father of petitioner; that is to say, an attempt was made to prove nonaccess by David. In refusing to follow this testimony the court does not wish to be construed as going to the extent of concluding that such witnesses were telling deliberate untruths. On the contrary, it is too easy for the memory to be mistaken on matters of precise months and year—of a period 35 years ago and yet the person testifying to such memory may feel every sense of conscious rectitude while still being mistaken." This is a fair criticism. The testimony referred to falls far short of showing conclusively or even with any reasonable probability that David was on Hawaii when the complainant was begotten. Two of these witnesses, named Ferreira, testified that they saw David doing some work on his father's house in Hamakua but they were so bewildered as to the time when they saw him as to render their testimony of no value. John K. Notley, another witness, testified that when he was a boy of eleven years he saw David, who was his uncle, in Hilo in September, 1893. Since the complainant was conceived in May of that year this testimony does not at all show that David was not in Honolulu at the time of her conception. Another witness, Charles K. Notley, one of the respondents, was also uncertain about dates. After testifying in substance that David, who was his brother, lived at Kakaako, he said David continued to live there until he went to

the Island of Hawaii in June, 1893, where he remained until the following September. Later he said he was mixed up in the date and that David left Honolulu in March, 1893. In view of the uncertainty of Notley's memory and his interest in the outcome of the case it would be altogether unsafe to give much credence to his testimony. The circuit judge was entirely justified in finding that there was not sufficient evidence upon which to predicate the conclusion that David was absent from Honolulu when the complainant must have been begotten and therefore could not have been her father.

There are assignments of error raising other questions which we deem it unnecessary to decide. The testimony which we have reviewed and which we think was properly admitted is sufficient to sustain the findings of fact made by the circuit judge and his conclusions of law.

The decree appealed from is affirmed.

*M. F. Prosser* and *H. L. Wrenn* (*Prosser, Anderson & Marx* and *H. L. Wrenn* on the brief) for complainant.

*A. G. M. Robertson* (*Robertson & Castle* on the briefs) for respondents other than C. K. Notley.