# IN THE MATTER OF THE ESTATE OF EMANUEL S. CUNHA, DECEASED.

## No. 4359.

MAY 31, 1966.

CASSIDY,* WIRTZ, LEWIS AND MIZUHA, JJ.,
AND CIRCUIT JUDGE KING ASSIGNED
BY REASON OF VACANCY.

---

* Acting chief justice when this case was submitted.

OPINION OF THE COURT BY LEWIS, J.

Testator, Emanuel S. Cunha, died January 10, 1918, leaving a will which created a trust providing for the distribution of income until the death of the last survivor of testator's wife, children and grandchildren living at the time of his death,[1] which is the end of the trust period. Harvey Douglas Murray, a grandson, became an income taker upon the death of his mother, Rose, and from and after the death of an uncle, Albert, had been receiving one-half of the income subject to certain annuities. Harvey died May 15, 1961, and the successor trustee under the will filed a bill for instructions as to the distribution of this share of the income. Instructions were sought upon the following questions:

[1] Two of these persons are living, appellant Cecily Cunha, and May Cunha Ross.

"a. Are Carma Rae Orr and Harve David Murray, legally adopted children of Harvey Murray, issue of Rose Angela Murray?

"b. Is Donna Patricia Murray issue of Rose Angela Murray?

"c. To whom is petitioner to pay the share of the income of the trust created under the will of Emanuel S. Cunha, Deceased, payable to the issue of Rose Angela Murray from and after the decease of said Harvey Murray?"

The chancellor instructed the trustee that Carma Rae Murray, Harve David Murray, and Donna Patricia Murray all are issue of Rose Angela Murray, and are to receive the share of the income that is payable to her issue. Cecily Cunha, daughter of testator's son, Clarence, has taken this appeal. If none of the appellees is issue of Rose, Cecily takes the whole of the income subject to the annuities. While Harvey lived she received one-half the income, and is entitled to at least that much, subject to the annuities.

We first consider the trustee's question "a," which concerns the adopted children. Harvey Murray adopted them on January 10, 1948, in a proceeding in the Juvenile Court of the First Circuit of the then Territory of Hawaii. He at that time was married to the mother of the children, Donna Lynnette Murray, of whom more will be said at a later time.

The chancellor held that the term "issue" is not ambiguous as used in the will, that testimony offered to show that the testator did not intend to include the adopted children of his grandson as "issue" was not admissible, and that if it were considered admissible "it would be wholly insufficient to constitute even prima facie proof of an intent on the part of the testator to limit the ben-

eficiaries of his estate to blood issue or blood descendants."
Appellant specifies as error the exclusion of the evidence
and the determination that testator meant to include
adopted children of his grandson. She further contends
that the court failed to consider the will as a whole.

The will was made November 15, 1917. In 1905, a
statute had been enacted, entitled "An Act to Declare the
Effect of an Adoption of a Child," reading in pertinent
part as set out in the footnote.[2] By S.L. 1915, c. 47, sec.
2, it was provided that, in making an order of adoption
of a child, the judge should declare "that, from that date,
to all legal intents and purposes, such child is the child
of the petitioner [the adopting parent] * * *." This same
provision was contained in section 6 of the amended 1915
act, set forth in S.L. 1919, c. 3; and in R.L.H. 1925, § 3039;
R.L.H. 1935, § 4525; and R.L.H. 1945, § 12276; but in
1945, in the course of an extensive revision of the section
made by S.L. 1945, c. 40, the provision that the order of
adoption should contain a declaration in the form above
stated was omitted. However, a new section 12276.01 of
the Revised Laws of Hawaii 1945 was adopted, providing
for "a new record of the birth in the new name of the
child with the names of the adoptive parents." As
amended, this is now R.L.H. 1955, § 331-14. The provi-
sions of the 1905 act first above noted, which had become

---

2 S.L. 1905, c. 83, § 1:

"An adopted child * * * shall inherit estate undisposed of by will
from its adopting parents the same as if it were the natural child of
such adopting parents, and shall not inherit estate from its natural
parents; the adopting parents of such child shall inherit estate un-
disposed of by will from such child the same as if such adopting parents
had been its natural parents, and the natural parents of such child and
their relatives shall not inherit estate from it; and for all other purposes
an adopted child and its adopting parents shall sustain towards each
other the legal relation of parents and child and shall have all the rights
and be subject to all the duties of that relation the same as if such
child were the natural child of such parents, and all such duties and
rights as between such child and its natural parents shall cease from
the time of the adoption."

R.L.H. 1945, § 12278, were amended by S.L. 1953, c. 115, and are now part of R.L.H. 1955, § 331-16, reading in pertinent part as set out in the footnote.[3]

This review of the statutes will serve as background for consideration of the decisions of this court. It is to be borne in mind, of course, that in the present case the will was made in 1917, testator died in 1918, the adoptions occurred in 1948, and the question of income taking by the second generation of Rose's issue, if any, arose in 1961.

The first case in this jurisdiction in which the interpretation of the word "issue" as used in an instrument arose with respect to adopted children, was *O'Brien* v. *Walker*, 35 Haw. 104 (1939), *aff'd*, 115 F.2d 956 (9th Cir. 1940). However, we begin with *Estate of Kamauoha*, 26 Haw. 439 (1922), *rehearing denied*, 26 Haw. 515, which construed the statutes in relation to the question whether the adopted son of a daughter who predeceased the intestate was an heir of the intestate. It was held that he was an heir by virtue of the 1915 act's provision[4] that the adoption decree should contain a declaration that, from the date of his adoption, the adopted child was "to all legal intents and purposes" the child of the adopting parent. This declaration did not appear in the decree of adoption as it should have, but the court read the decree as though it contained such declaration. (26 Haw. at

---

[3] "§ *331-16. Effect of adoption.* A legally adopted child shall be considered to be a natural child of the whole blood of the adopting parent or parents under the provisions of chapter 318, relating to the descent of property, and the former legal parent or parents of an adopted child and any other former legal relatives or next of kin shall not be considered to be related to such child under such provisions; and for all other purposes an adopted child and his adopting parent or parents shall sustain towards each other the legal relationship of parents and child and shall have all the rights and be subject to all the duties of that relationship, the same as if the child were the natural child of such adopting parent or parents, and all such duties and rights as between such child and its former legal parent or parents shall cease from the time of the adoption * * *."

[4] S.L. 1915, c. 47, § 2, *supra.*

444.) The 1915 statute, which provided for this status of an adopted child, was deemed controlling because it was the most recent statute. At the same time the court recognized that the earlier 1905 act, S.L. 1905, c. 83, did not provide for inheritance by an adopted child *through* his adoptive parent. "In other words, it [the 1905 act] constitutes the adopted 'child' *for some purposes* the 'child' of the adopting parents but clearly does not constitute it such 'child' *for all purposes."* (26 Haw. at 447-48.)

In *O'Brien* v. *Walker, supra,* 35 Haw. 104 (1939), *aff'd,* 115 F.2d 956 (9th Cir. 1940), the court had before it for construction a trust deed executed in 1896, which provided that upon the death of John A. Cummins, referred to in the opinion as the "trustor," the trust income should go to the children surviving him, subject to certain charges, and upon the death of the last surviving child the corpus should vest in "the lawful issue of the children aforesaid then surviving." Mr. Cummins died on January 21, 1913. On December 19, 1914, one of the daughters and her husband adopted a child, Margaret Mamo Clark. The time having arrived for the termination of the trust the question was whether the adopted child was entitled to a share of the corpus.

In holding that the adopted child took as "issue" of the trustor's daughter, the court rejected the precedents construing the word "issue," when used in a will or trust instrument, as meaning "children of the blood." The court at the same time recognized that "this appears to be the general rule of construction throughout the United States and England," founded upon "the presumption * * * that a trustor prefers his own blood to that of a stranger to his blood, unless the contrary clearly appears." (35 Haw. at 113.) It noted that surrounding circumstances have nevertheless been considered by courts following this rule, giving as examples "an adoption by the

trustor or by his immediate family before execution or the prior passage of adoption statutes defining the effect and status of adoptions," the theory being that "such surrounding circumstances must reasonably have been considered by the trustor and were in his mind at the time and therefore tend to reflect his intention." (35 Haw. at 114.)

Stressing the common law background of these decisions, the court in *O'Brien* v. *Walker* distinguished them, citing what is now R.L.H. 1955, § 1-1,[5] and stating that "a totally different problem of construction would face an equity court in a jurisdiction in which the ancient customs of its people had not only sanctioned adoptions and regarded adopted children as children of the blood but also considered the status as a very sacred relationship without any trace of discrimination or prejudice toward adopted children in favor of blood children." (35 Haw. at 116.) The court regarded this as the situation in Hawaii and found that this had been recognized in early cases. It concluded, "that such customs and usage existed and that they may therefore be drawn upon by courts in construing the intention of a trustor in the use of the word 'issue' where the intention is not clearly indicated in the context of the instrument itself or from the surrounding circumstances." (35 Haw. at 125.)

Finding nothing of significance in the context of the instrument, the court in *O'Brien* turned to the surrounding circumstances. Mr. Cummins was a part-Hawaiian married to a Hawaiian and the court deemed it reasonable

---

[5] "§ *1-1. Common Law of [State]; exceptions.* The common law of England, as ascertained by English and American decisions, is declared to be the common law of the [State] of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the [State], or fixed by Hawaiian judicial precedent, or established by Hawaiian usage; provided, that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the [State]."

to assume that he was acquainted with the ancient customs. "In respect to such a trustor," said the court, "a presumption of fact that he intended to include adopted children and not to discriminate against them in preference to his blood, unless the contrary clearly appears from the context of the deed and from the surrounding circumstances, * * * would be more in order than the reverse blood-preference presumption of the less familiar and more distantly removed common law of England." (35 Haw. at 131-32.)

The holding of this case that the adopted child was "issue" of the trustor's daughter rested, as the above shows, partly upon the background of the trustor himself, and partly upon what the court, with evident reference to the statute set out in note 5, *supra,* spoke of as "the ancient Hawaiian customs and usage of adoption as a statutory exception to Hawaii's common law." (35 Haw. at 132.)

We come now to *Estate of Farrington,* 42 Haw. 640 (1958). Testator made his will on September 12, 1929. He died October 6, 1933. A son, Joseph R. Farrington, died June 19, 1954. He having been a trustee, the matter of appointment of a successor trustee or trustees came before the chancellor, and under R.L.H. 1945, § 12572, now R.L.H. 1955, § 340-2, this in turn involved the determination of the majority in number and interest of the beneficiaries, nominations having been filed. It was in this connection that the question arose whether the adopted children of Joseph R. Farrington were his "issue" under the terms of the testator's will. The decision that they were rested squarely on the ancient Hawaiian usage, the status of an adopted child under Hawaiian judicial precedent, the statute set out in note 5, *supra,* and an adopted child's right of inheritance as determined in *Estate of Kamauoha, supra,* 26 Haw. 439 (1922), followed

in *Estate of Holt,* 42 Haw. 129 (1957). Referring to the argument made by appellants in the *Farrington* case that "if this court [in *O'Brien* v. *Walker*] had intended to establish in this jurisdiction a new canon on construction applicable in general to decedents in Hawaii, irrespective of their family and other background and directly contrary to that long-established in other common-law jurisdictions, it would have announced the canon in unmistakable terms," the court stated that testator, "had been for many years a resident of the Territory of Hawaii and entered fully into its life, having occupied the position of governor for eight years, [and] presumably would be familiar with the Hawaiian customs of adoption and the interpretation given to the words 'issue' and 'children' in Hawaii for more than seventy-five years prior to the date of his will." (42 Haw. at 658.) The court concluded:

"In the instant case had the testator not desired our courts to follow the unbroken decisions of many years holding adopted children as 'children' or 'issue' of the adopting parents, he could have avoided this by specifically limiting the income or remainder to issue of the blood." (42 Haw. at 660.)

Testator, Emanuel S. Cunha, no less than Governor Farrington, presumably was familiar with the Hawaiian customs of adoption. He came to Hawaii nearly thirty years before Governor Farrington, in the days of the Kingdom. Coming from Portugal at the age of sixteen or thereabouts, he lived here some fifty years. He was acquainted with the King, and attended Palace functions. He had a thriving saloon business, was well known in the community, and participated in community affairs.

There was testimony that testator "did not read or write too well." The will obviously was drawn by a lawyer; the record shows that testator was a client of

Henry Holmes, who as the court knows was a prominent lawyer in his day.

The court followed in *Farrington* a principle which has been well stated in the case of *In re Heard's Estate,* 49 Cal. 2d 514, 522, 319 P.2d 637, 642-43.[6] There the court said:

> "* * * We cannot suppose that wills are made in a vacuum; that the status of an adopted child being the same as a biological offspring, which is the public policy of the state, may be completely ignored, or that it was ignored by a testator when making a will any more than he may be said to ignore many other rules of law and public policy. When he has not said anything about 'adopted' children using that word or the equivalent, the court in seeking his intent is in fact endeavoring to ascertain what his wishes would be if adopted children were called particularly to his mind. Lacking that, the court must assume, unless a contrary intent is expressed, that he intended that his will would fit it and be compatible with the general body of the law and public policy. Otherwise the court is left with little if any basis for interpreting the instrument. Courts thus, by necessity, draw on the statutes, case law and public policy in construing an instrument as they must suppose that the draftsman did not intend to pursue a course contrary to them unless he so states. The draftsman of wills may exclude adopted persons if he wishes." (319 P.2d at 642-43.)

As to the policy of our law, the importance of which

---

[6] We quote from *Heard* because of its excellent statement of the reasons for adopting what may be called a "reverse presumption," that is, the reverse of the traditional common law approach, and not with any idea of excluding surrounding circumstances from consideration. In *Farrington*, both the surrounding circumstances and the context of the will were recognized as sources for ascertainment of the intention expressed by the testator in the use of the word "issue."

appears from the foregoing, a summary is in order at this point. In 1915,[7] two years before the will was executed, the legislature had provided that an adopted child is "to all legal intents and purposes" the child of the adopting parent. At the time of their adoption Harve and Carma presumably were, according to the terms of the statute, then R.L.H. 1945, § 12276.01, as amended, now R.L.H. 1955, § 331-14, registered in the then Bureau of Vital Statistics as the children of Harvey Murray. When the question of income taking by these adopted children arose in 1961, the statute[8] provided that, as adopted children, they were to be considered Harvey Murray's natural children under the provisions of R.L.H. 1955, c. 318, relating to descent. Thus the policy of the law has been to treat them as natural children, and this policy had its origin in statutory law before the will was executed, and in case law, custom and usage long before that.

It is argued that the word "issue," used in the will in reference to the income takers, is to be distinguished from the word "heirs," used in the will in reference to the disposition of the corpus;[9] that the use of the word "heirs" in the latter provision, signifies that when the testator came to disposition of the corpus he had exhausted his specific desires and said, "Now let the law take its course," quoting from 5 American Law of Property, § 22.57 (Casner ed. 1952), as set out in *Estate of Holt, supra,* 42 Haw. at 138; and that: "When a testator uses the word 'heirs' he means those for whom the law provides. When

[7] Though we commence this review with the 1915 act, we do not mean to intimate that the 1905 act was without significance.

[8] R.L.H. 1955, § 331-16, n. 3, *supra.*

[9] The will provides that upon the termination of the trust the corpus is to be held "for such persons as would be the heirs at law and next of kin of me Emanuel S. Cunha if I had died immediately before the end of the trust period hereby created according to the law of the Territory of Hawaii regarding the descent and distribution of the estates of persons dying intestate."

he uses the word 'issue' he means his descendants." But this argument presupposes that descendants are to be determined according to the common law presumption, which presumption does not prevail here for reasons already stated. The argument runs full circle. The question presented is a different one, that is, whether there is any acceptable indication that testator rejected the policy of our law of treating adopted children as natural children.

We find it unnecessary to determine whether the evidence which the court admitted subject to motion to strike and later ordered stricken was admissible. We agree with the court below that at all events it was insufficient. It consisted chiefly of evidence that testator wanted to keep his property within "his family," his "close family"— that he had the "rather old fashioned European idea of a family being very closely knit."

There also was evidence that, on one occasion, at the funeral of his brother-in-law, he objected when "a very prominent lady" started to wail according to the Hawaiian custom, saying: "This is no kanaka funeral." On the other hand, his own wife was "a little Hawaiian." This evidence confirms testator's familiarity with Hawaiian customs but fails to show that he had any specific intent with regard to the status of adopted children.

It is argued that "the practice [of adoption] was uncommon at the time Emanuel S. Cunha wrote his will." This is an argument that testator did not have the matter in mind. That being so the presumption takes its course. Cases relating to adoptions taking place after testator's death, excluding the adopted children from benefits, are inapplicable under the rule laid down in *Farrington*. Joseph Farrington's children were adopted after Governor Farrington's death.

Further, it is argued that "the internal evidence of the will itself" calls for a reversal of the chancellor's decision.

Consideration of this argument calls for further analysis of the will. For some unexplained reason, testator made no gift of income to the "issue" of one of his children, Albert.[10] He provided that, after the death of his wife and subject to the payment of annuities to two women, one his wife's sister and the other his wife's friend, the net income should be divided into three equal parts. One part was to go to Albert for life, but on Albert's death, subject to payment of an annuity to Albert's daughter May, who was living at the time of testator's death, this one-third was to be divided between the other two children, that is, Rose and Clarence, and on the deaths of Rose and Clarence was to go to their issue per stirpes. Accordingly, when Albert died in 1933 his daughter, May, received only an annuity; his son Richard, born after testator's death, received nothing; Harvey, who had come into the share of his mother, Rose, had his share increased from one-third to one-half; and Cecily, appellant herein, who had come into the share of her father, Clarence, likewise had her share increased from one-third to one-half.

Cecily, who now urges that her share has increased from one-half to the whole of the income, subject to the annuities, characterizes as "an absurd result" the possibility that the adopted children may come into the whole income, subject to the annuities, as could happen if May survived Cecily. But whatever absurdity might result would be due to the deferral of the vesting of the corpus for the life of May, a grandchild who takes only an annuity of $1200 per year. According to the terms of the will it might even happen that May would survive Cecily and that there would be no issue of Rose or Clarence to take the bulk of the income during the last years of the trust.

---

10 Albert had a daughter, May, living at the time of testator's death, and a son born thereafter. The daughter has two children; the son, four.

Appellant contends that "the prime beneficiaries he [testator] had in mind for the income were the issue he knew, including appellant Cecily Cunha," and that the will "reflects his desire that no adopted issue take at the expense of the beneficiaries he knew * * *." There is nothing to bear this out. What the will does demonstrate is that testator deliberately excluded from the income the descendants of Albert, even if they were blood issue, except for the annuity to May. Albert was 38 at the time of the making of the will, could be expected to have more children of the blood, and in fact did have. May was six years old, could be expected to have children of the blood, and in fact did have. Of this family group, testator excluded all except the ones he knew, namely Albert and his daughter, May. With respect to the other two family groups his intentions were the opposite. The will plainly provided for the taking of income by the issue of Rose and Clarence whether testator knew them or not. And when the adopted children take it will be purely a coincidence that this will be at the expense of a beneficiary that testator knew, namely, Cecily Cunha, the appellant.

Finally, it is argued that no case in this court has involved adopted children who were so many generations removed from the testator. The adopting parent in this case was a grandchild of the testator. We see no significance in this. However, we take note that the adopted children claim in this case as "issue" of Rose, the mother of the adopting parent, and not as "issue" of the adopting parent as was the situation in *O'Brien* and *Farrington*. In *Estate of Kamauoha, supra,* this matter received consideration. After first holding that, under the succession statute there involved, the question was who were the "issue" or "descendants" of the intestate's daughter, who had adopted a son, the court at a later point in the opinion considered the alternative, *i.e.,* the hypothesis that the

question was who were the "issue" or "descendants" of testator himself. (26 Haw. at 463.) The court there stated:

> "* * * If the adopted child under our statute is for all legal purposes the child of the adopting mother, it is likewise for all legal purposes the grandchild of the father of that mother and is his lawful lineal descendant * * *."

*Cf., St. Louis Union Trust Co.* v. *Greenough,* 282 S.W.2d 474, 479-84 (Mo.) ; *Bryan Estate,* 86 Pa. D. & C. 543, 545; *but see Bullock* v. *Bullock,* 251 N.C. 559, 111 S.E.2d 837, 840.

We conclude that, since the adopted children became Harvey Murray's children, they likewise became the descendants or "issue" of Harvey's mother, Rose, within the meaning of the will. They are income beneficiaries under the will, as such issue.

We proceed to the trustee's question "b," to wit: "Is Donna Patricia Murray issue of Rose Angela Murray?" Donna Patricia Murray, represented in this proceeeding by her guardian ad litem, was born March 14, 1950, at Glendale, California. Her mother, Donna Lynnette Murray, was at the time the wife of Harvey Murray. They had married the second time (after an intervening divorce) on April 30, 1949.

After admitting, subject to motion to strike, the evidence offered by appellant Cecily Cunha to show that Donna Patricia was not the child of Harvey, the chancellor in his decision ruled that the evidence was inadmissible and consequently the presumption of legitimacy, arising from the child's birth in wedlock, was not rebutted. Donna Patricia Murray was found to be the legitimate daughter of Harvey Murray and issue of Rose.

The proffered evidence consisted of the record in a California divorce proceeding in which Harvey Murray,

as cross-complainant, obtained a divorce from Donna Lynnette Murray, mother of Donna Patricia Murray, after the birth of the child; and the will of Harvey Murray, made January 18, 1960, some years after the divorce. The decision below was that "the interlocutory and final decrees of divorce in the California proceedings were wholly void, a nullity, as against Donna Patricia Murray, in that the Court had no jurisdiction over the child"; that "the statements of Harvey Douglas Murray in the divorce proceedings and in his Will are inadmissible, being a violation of the well-established rule that a parent (except in rare circumstances not present here) is not competent to testify so as to bastardize a child born in wedlock"; and that "even if the statements and declarations of Harvey Murray were in any other way found to be admissible they would nevertheless be inadmissible because of not having been made 'ante litem motam,' or prior to the time that divorce litigation was already under way between himself and Donna Lynette [sic] Murray." Appellant challenges all of these rulings.

In the California divorce proceedings the wife's verified complaint for separate maintenance (second amended complaint) averred that after her marriage in Honolulu on April 30, 1949, she went to Burbank, California, on May 4, 1949, to establish a home pursuant to her husband's agreement that he would follow her there; that her husband resided with her at the home she established in Burbank from July 11 to July 17, 1949, when he went to San Francisco; and that Donna Patricia was issue of the marriage. The complaint inter alia sought child support.

Harvey's answer to the second amended complaint, also verified, averred that there had been no sexual intercourse between husband and wife since their marriage on April 30, 1949; that the wife had left the husband on May

3, 1949 and they had not lived together since that date; and that the child born March 14, 1950 was not his child. By his amended cross-complaint Harvey sought a divorce on grounds of extreme cruelty, and averred that the parties had entered into a property settlement agreement dated July 29, 1952. He again swore that the parties had separated May 3, 1949, and that the child born March 14, 1950 was not issue of the marriage.

There was no answer to the amended cross-complaint, and the wife's default was entered. By the terms of the property settlement agreement, which the court approved, she was to receive $75,000 ($15,000 forthwith and $60,000 in monthly payments over a period of years), provided there was a divorce.

On the basis of evidence adduced at the trial, of which the wife waived notice and at which she did not appear, the court made its findings of fact and conclusions of law, the subject matter thereof being, as set out, the wife's amended complaint, the husband's answer thereto, and the husband's amended cross-complaint. The court found untrue the allegations of the wife's amended complaint for separate maintenance, except the fact of the marriage, found true the allegations of the amended cross-complaint for divorce, approved the property settlement agreement, found that Harvey was entitled to a divorce, and included among the "conclusions of law" the following: "That that certain female child born to plaintiff and cross-defendant on the 14th day of March, 1950 is not the child of the defendant and cross-complainant Harvey Douglas Murray and no decree should be made against him for its maintenance and support." On the day of the trial, March 20, 1953, after making the aforesaid findings and conclusions, the court entered judgment dismissing the wife's complaint, granting the husband a divorce to become final in one year, and incorporating the property settlement agree-

ment as a part of the decree. In this interlocutory judgment, entered March 20, 1953, and in the final judgment of divorce, entered June 1, 1954, there was included the following: "It is further hereby ordered, adjudged and decreed that the defendant and cross-complainant Harvey Douglas Murray be and it is hereby declared that he is not the father of a certain female child born to plaintiff and cross-defendant on or about the 14th day of March, 1950."

Appellant concedes that these proceedings did not make the issue of Donna Patricia's paternity *res judicata* here.[11] Her contention is: "While the findings and judgment of the California court are not *res judicata*, they are admissible evidence as to her [Donna Patricia's] paternity and legitimacy." The guardian ad litem, on the other hand, discounts any distinction between the *res judicata* effect of the California proceedings and the admissibility of the record thereof, and calls to our attention the California cases of *Gonzales* v. *Pacific Greyhound Lines*, 34 Cal. 2d 749, 214 P.2d 809, and *Daniels* v. *Daniels*, 143 Cal. App. 2d 430, 300 P.2d 335. These cases show that the only issue before the California court in the divorce suit was the wife's right to an allowance for the support of Donna Patricia, and that the California proceeding was not determinative of the paternity of the child for any other purpose.[12] True, the interlocutory decree and final judgment failed to repeat the statement that had been made in the findings and conclusions as to the purpose of finding that the child was not the husband's, but this does not change the result. Other than for its

---

[11] See *Adamson* v. *Adamson*, 209 Cal. App. 2d 492, 26 Cal. Rptr. 236, 242; *In re Stroope's Adoption*, 232 Cal. App. 2d 581, 43 Cal. Rptr. 40, 42-3; Annot., 65 A.L.R.2d 1381, 1396.

[12] Custody also could have been in issue in the divorce proceedings, but in fact was not in contest.

bearing on the right to support, the determination of paternity was without effect in California. *Daniels* v. *Daniels, supra.* After these proceedings, as before, the presumption of legitimacy arising from the child's birth in wedlock obtained in any suit in California to which the child was a party.[13] *Gonzales* v. *Pacific Greyhound Lines, supra.* Hawaii has at least as much leeway to depart from the California judgment as does the state where it was rendered. *In re Burns,* 49 Haw. 20, 37-8, 407 P.2d 885, 895, citing *New York ex rel. Halvey* v. *Halvey,* 330 U.S. 610, 614-15.

Appellant concedes that: "Under certain circumstances, a prior judgment is not admissible evidence against a person who was not a party to it, or privy to a party." In *Territory* v. *Howell,* 25 Haw. 320, the court held that a certain judgment against the County of Maui was not admissible against defendants, who were not parties to the earlier suit, as "evidence * * * of the existence of any of the facts necessary to support that judgment." (25 Haw. at 324.) The court stated:

"* * * A judgment is offered in evidence either to establish the mere fact of its own rendition and those legal consequences which result from the fact or is offered to prove not only the fact that such a judgment has been rendered and so let in all the necessary and legal consequences, but as a medium of proving some fact found by the verdict or upon whose supposed existence the judgment is based. For the first of these purposes, that is, for establishing the fact that such

[13] It is interesting to note that under section 195 of the California Civil Code the presumption of legitimacy was conclusive unless disputed by "the husband or wife, or the descendant of one or both of them." The two adopted children expressly state that they do not dispute the legitimacy of Donna Patricia and indeed join in her position. However, except as to the status of the judgment, no contention has been made that the legitimacy of Donna Patricia should be adjudged according to California law, and we do not pursue the matter.

a judgment had been rendered and all the consequences of such a judgment, the judgment itself is invariably not only admissible as the proper legal evidence against the world but usually conclusive to prove that fact. The mere fact that such judgment was rendered can never be considered as *res inter alios acta,* neither can the legal consequences of such a judgment be so considered. But with reference to any fact upon whose supposed existence a judgment is founded the proceeding may or may not be *res inter alios* and consequently may or may not be evidence according to the circumstances, considering the nature of the facts themselves and the parties. * * *" (25 Haw. at 323.)

Appellant urges, however, that "where a fact may be established on evidence of reputation alone, a judgment between strangers is admissible." Among the cases cited for this proposition is *Patterson* v. *Gaines,* 47 U.S. (6 How.) 550, 599, which involved a question of legitimacy. Legitimacy turned upon whether there was a valid marriage between claimant's mother and decedent Clark. One of the issues was the nullity of the mother's prior marriage to one De Grange on account of De Grange having a wife at the time. There was testimony of De Grange's earlier marriage which the court accepted. There also was hearsay testimony of the conviction of De Grange for bigamy. This the court disregarded. The record of the bigamy conviction could not be produced. The court indicated that if the record of the bigamy conviction could have been produced it would have been admissible on the ground that "wherever reputation would be admissible evidence, there a verdict between strangers, in a former action, is evidence also; such as in cases of manorial rights, public rights of way, immemorial custom, disputed boundary, and pedigrees." (47 U.S. at 599.)

This was dictum, which was repeated in *Grant Bros. Constr. Co.* v. *United States,* 232 U.S. 647, 663, not a pedigree case, where it was stated that "a judgment in a prior action is admissible, even against a stranger, as *prima facie,* but not conclusive, proof of a fact which may be shown by evidence of general reputation, such as custom, pedigree, race, death and the like, and this because the judgment is usually more persuasive than mere evidence of reputation." The dictum, however, was applied in *United States* v. *Mid-Continent Petroleum Corp.,* 67 F.2d 37, 49 (10th Cir.), in which state court judgments were admitted in evidence in determining the heirs of a member of the Creek Tribe, in federal litigation which originated some 20 years after intestate's death.

In each of these cases the court was talking about general or community reputation. Appellant cites *Model Code of Evidence* rule 525 of the American Law Institute, and *Uniform Rule of Evidence* 63 (27) of the National Conference of Commissioners on Uniform State Laws, which set out the following as a proposed exception to the hearsay rule:

"Evidence of reputation in a community * * * if * * * (c) the reputation concerns the birth, marriage, divorce, death, legitimacy, relationship by blood or marriage, or race-ancestry of a person resident in the community at the time of the reputation, or some other similar fact * * * which the judge finds likely to have been the subject of a reliable reputation in that community."

It is to be noted that both organizations have appended to the proposed rule the following comment:

"Most of the decisions limit evidence of reputation to a reputation of a former generation. * * *"

As to pedigree matters, clause (c) of the proposed rule, the comment reads:

"\* \* \* the few authorities are in conflict concerning Clause (c)."

It is to be noted, moreover, that Donna Patricia was not a resident of San Francisco, where the divorce was obtained, so far as appears.

In respect of judgments as evidence of community reputation, as is well stated in 1 Greenleaf, *Evidence,* § 139, at 227 (16th ed.) :

> "\* \* \* A verdict did once represent the reputation of the neighborhood. But in the modern practice a jury's verdict cannot be regarded as in any true sense a vehicle of reputation."

In *Pile* v. *McBratney,* 15 Ill. 314, 319, which is cited in *Grant Bros. Constr. Co., supra,* 232 U.S. at 663, the rule is explained as follows:

> "\* \* \* But there is a class of cases in which a judgment or decree is *prima facie* evidence against third persons of a fact that was necessarily found thereby. Where a fact may be established by proof of general reputation, such as custom, prescription, pedigree, or the like, the record of a judgment or decree finding the same fact is *prima facie* evidence thereof against third persons. The solemn adjudication of a court upon testimony is justly regarded as stronger proof of the fact than mere evidence of general reputation."

So, also, in 2 Freeman, *Judgments,* § 1044 (5th ed.), it is stated as to "questions which in general are susceptible of being determined mainly by evidence of common repute; such as questions in regard to customs, tolls, pedigrees, prescription, etc." that: "The solemn adjudication of a court based, as it is presumed to be, upon testimony is properly considered as better proof of a fact than evidence of mere general reputation can be."

Thus if the judgment is admissible it must be upon the ground of the presumed reliability of the testimony upon which it was based. No such presumption can be indulged here. This is not the type of case for which such a rule is intended. Other rules fit this case. Before Harvey Murray's death proper proceedings could have been taken to perpetuate testimony. H.R.C.P., Rule 27(a). Or the testimony taken in the California court might have been produced here and objections to its admissibility met, if that was possible, on grounds qualifying such evidence for an exception under the pedigree rule.[14] These rules cannot be hurdled by offering the judgment as a thumbnail rendition of the testimony.

The legislature has made provision for use of a judgment in the manner here desired in a limited class of cases. R.L.H. 1955, § 224-24, enacted in 1923, S.L. 1923, c. 169, provides that, to show devolution of title from an intestate, a decree or order of distribution of the intestate's estate "may be received in evidence, and, when so received, shall constitute prima facie proof of the descent of such title" to the named distributees. It further is provided that, for a decree or order to be so used, it must have been entered at least ten years before commencement of the cause in which it is to be received in evidence. In *Drummond* v. *Makaena,* 30 Haw. 116, this court held that an order not coming within the terms of the statute was inadmissible. Previously, in *Kaupena* v. *Kaio,* 20 Haw. 653, which antedated the statute, the court had held that a decree of distribution of personal property in probate proceedings was inadmissible in a quiet title action against a party who did not appear in the probate proceedings. *Kaupena* was cited by counsel for appellee

---

[14] In fact, Harvey Murray's declarations in his sworn pleadings in the divorce case were offered in this case, but did not come within the pedigree exception because not *ante litem motam* as will be seen.

in *Drummond,* and counsel for appellant in that case replied that by reason of the 1923 statute, now R.L.H. 1955, § 224-24, *supra,* this decision was no longer law. The opinion in *Drummond* disposed of the point in the manner above noted.[15]

It is true that the contention that a judgment is admissible to show a fact which could be shown by community reputation, here urged, was not presented in these two cases. Perhaps the point deserves consideration in a suitable case—one in which liberalization of the rules of evidence is appropriate. But this is not such a case. By way of comparison, we cite R.L.H. 1955, § 224-23, enacted by S.L. 1933, c. 89,[16] and the committee reports thereon (H. Jour. 1933, p. 663; S. Jour. 1933, p. 847), as well as R.L.H. 1955, § 224-24, *supra.* The judgment sought to be used in this case was rendered less than ten years before the bill for instructions was filed. The party against whom it is sought to use the judgment was a minor *in esse,* unrepresented by a guardian. She did not attain her majority prior to Harvey Murray's death, in fact still is a minor. Donna Lynnette Murray defaulted only after receiving a substantial property settlement.[17] Previously, she had averred that her husband resided with her from July 11 to July 17, 1949, which was eight months before Donna Patricia was born. Admission in the present case of the judgment in the divorce proceeding as evidence that the

---

[15] In both cases, the order or decree in question antedated the statute which is now R.L.H. 1955, § 317-14, construed in *Chun Ming* v. *Ho,* 45 Haw. 521, 534-38, 371 P.2d 379, 389-92.

[16] This statute provides for the use of pedigree testimony given in court proceedings prior to January 1, 1880, if such testimony shows that the witness was a member of the family concerning which he testified, without further evidence that the witness was a member of the family.

[17] Appellant suggests that "Donna Patricia's illegitimacy has been * * * admitted by her mother's default * * *." This contention does not seem to have been presented in the court below. In any event, the *post litem motam* objection would apply to such evidence, the same as to Harvey Murray's declarations in the divorce suit. See *infra.*

husband was not the father of Donna Patricia would deprive the latter of her right to be heard, specifically her right to object to the admissibility of the testimony adduced in the divorce proceeding and her right to cross-examine.

No case has been cited in which a judgment in a divorce proceeding was admitted as evidence of the facts upon which it was based, against a minor who was not a party to the divorce proceeding. *In re Walker's Estate,* 176 Cal. 402, 168 Pac. 689, clearly is distinguishable. For an understanding of the case it is necessary to bear in mind that the court viewed the issue as being "what weight * * * should be accorded the fact that at the time the children were begotten an interlocutory decree of divorce had been granted." (168 Pac. at 693.) The interlocutory decree was deemed admissible to show that the parties, while still husband and wife, were not cohabiting in the sense of living together in that relationship—this was important since under a California statute a conclusive presumption of legitimacy applied to issue of a wife cohabiting with her husband. The interlocutory decree also was deemed admissible as "tending to establish a relationship from which, depending upon other circumstances established, and evidence of the disposition and character of the parties, the jury might fairly draw the inference that, notwithstanding opportunity therefor, intercourse was not had on the occasions when the husband visited the wife." (168 Pac. at 693.) Further clarification of the court's views in *Walker* is afforded by a second opinion, 180 Cal. 478, 181 Pac. 792, rendered when the case again came up for review after retrial. The court stated: "The material point of the interlocutory decree was that it suspended marital rights and obligations and the usual incidents of the marital relation, and destroyed any inference or presumption from the fact of marriage that the parties were living together

or having intercourse." (181 Pac. at 798-99.) Hence, the case was one in which the decree itself was a material fact, as distinguished from use of the decree to prove "some fact * * * upon whose supposed existence the judgment is based."[18]

In *Schlenker* v. *Ferdon,* 21 Ohio App. 222, 153 N.E. 113, it was held that where a child claiming the right of inheritance showed birth in wedlock, and the other claimant, who sought to inherit on the theory deceased left no issue, placed his whole reliance on a divorce decree in which it was adjudged that no issue was born of the marriage, the conclusion that the child was the child of the deceased would be affirmed, the case being one where the question of fact was "established without any evidence offered to the contrary." It will be noted that the record of the divorce was not treated as evidence. But it apparently was not urged that it should be, appellant's reliance being on the doctrine of *res judicata.* However, *Shuman* v. *Shuman,* 83 Wis. 250, 53 N.W. 455, is squarely in point. The question was whether decedent's children were by her first husband, a Mr. Ingle, or her second husband, Mr. Shuman. As appears from the statement of the case:

"The circuit court refused to allow the complaint and the testimony of Mr. Ingle in the divorce action (which was substantially all the testimony in that case) to be read in evidence. Mrs. Ingle did not defend the action. Had the above testimony been received, it would have appeared by the complaint that the cause assigned for a divorce was desertion, in that for nearly two years then last past Mrs. Ingle had refused to have sexual intercourse with her husband, and asserted that she would not cohabit with him or

[18] Quoted from *Territory* v. *Howell, supra,* 25 Haw. at 323.

allow him the privileges of a husband in the future. The testimony of Mr. Ingle substantiated the allegations of the complaint in the particulars aforesaid. * * *" (53 N.W. at 456.)

The judgment was affirmed, the opinion stating:

"It is clear that the complaint and the testimony of Andrew Ingle in his undefended action for a divorce, were properly excluded as evidence of non-access. These are nothing more than sworn statements of the husband, and their character is not changed by the fact that they were made in the course of a judicial proceeding which resulted in the divorce judgment. Such judgment was admissible and was admitted to show the *status* of the parties to the action, that is, that they ceased to be husband and wife on November 15, 1884, but not to prove that a child begotten during the coverture is a bastard, or would have been such but for the subsequent intermarriage of her mother with *Alexander Shuman.* * * *" (53 N.W. at 457.)[19]

Considered as declarations under the pedigree rule,[20] the averments of Harvey Murray in the divorce proceeding were inadmissible because not *ante litem motam.* They were made in the course of litigation about the child's parentage, having to do with the husband's duty of support. The present litigation concerns the same factual

---

[19] *Kleinert* v. *Ehlers*, 38 Pa. 439, is not to the contrary. The claimant having prevailed in establishing her legitimacy, the appeal brought up for review the trial court's refusal to charge the jury as requested by defendant-appellant. In affirming the judgment the court remarked that "due effect—full as much as it deserved to have—was given to the record [of divorce] when it was referred to the jury as establishing the desertion of the wife." (38 Pa. at 445.) The court did not decide whether the record was admissible or, rightly considered, had the effect given it in the trial court, only that appellant had not been prejudiced.

[20] As to the pedigree rule, which permits evidence of declarations to show pedigree as an exception to the rule excluding hearsay evidence, see *Helekahi* v. *Laa*, 32 Haw. 1; *Drummond* v. *Makaena, supra*, 30 Haw. 116, 129; *Makekau* v. *Kane*, 20 Haw. 203.

matter but has a different consequence, having to do with the child's right to take a share of the income under Emanuel S. Cunha's will. Thus the issue of fact was and is the same—only the consequences of the factual determination are different in the two suits. This difference is insufficient to meet the objection that the declarations were *post litem motam. Cf., Sugrue* v. *Crilley,* 329 Ill. 458, 160 N.E. 847, 849-50; *Rollins* v. *Wicker,* 154 N.C. 559, 70 S.E. 934; *Ferguson* v. *Smazer,* 151 Conn. 226, 196 A.2d 432; see also *Succession of Anderson,* 176 La. 66, 145 So. 270. *But see Welch* v. *All Persons,* 85 Mont. 114, 278 Pac. 110, 114.

We conclude that no part of the record of the proceedings in the California court was admissible as evidence of Donna Patricia's parentage.

It may be assumed that the record of the proceedings in the California court would be admissible to show how the matter of Donna Patricia's parentage was disposed of upon the divorce.[21] But this would not serve appellant's purpose. So viewed, the judgment would "establish the mere fact of its own rendition and those legal consequences which result from that fact."[22] As seen, the legal consequences which resulted from the fact of the judgment flowed only between the parties, Donna Lynnette Murray and Harvey Murray. The California record might also have shown that Harvey Murray was consistent in his denials of parentage, had there been occasion to establish that point. In fact, that point was not reached.

The record before us is devoid of any admissible evi-

---

[21] *Cf., Bower* v. *Lunney,* 27 Tenn. App. 87, 178 S.W.2d 91, 96-7, citing *Eisenlord* v. *Clum,* 126 N.Y. 552, 27 N.E. 1024. In the latter case, as noted by the Tennessee court, it was held that the judgment in a suit brought by a father for the seduction of his daughter was not admissible in evidence on the claim of her child to inherit from the putative father. (27 N.E. at 1026.)

[22] Quoted from *Territory* v. *Howell, supra,* 25 Haw. at 323.

dence as to nonaccess, that is, lack of opportunity for sexual intercourse between Harvey Murray and his wife Donna Lynnette, at the time of Donna Patricia's conception. The presumption of legitimacy may be overcome by evidence of nonaccess, but there is none. This court has held that the presumption may be overcome, as well, by direct or circumstantial evidence of lack of sexual intercourse, not necessarily excluding opportunity therefor. *Godfrey* v. *Rowland,* 16 Haw. 377, 386-87, *rehearing denied,* 16 Haw. 502, *overruled on another point* by *Parke* v. *Parke,* 25 Haw. 397, 405; *cf., Hopkins* v. *Chung Wa,* 4 Haw. 650, 657. The turning point here is the nature and extent of proof required. Under the ruling above made as to the record in the California divorce proceeding, we have before us for consideration as evidence of Donna Patricia's paternity, only the out-of-court declaration of Harvey Murray in his will that Donna Patricia was not his child. The second paragraph of Harvey Murray's will was as follows:

"*SECOND.* I hereby declare that I am married, and that my wife's name is DOROTHY D. MURRAY; that I have no natural children of that marriage or any other marriage, although I did adopt two children of Donna Lynnette Murray; that I specially declare that a child born to Donna Lynnette Murray on the 14th day of March, 1950, is not my child; that all my property, is my separate property."

May the presumption of legitimacy be overcome by this out-of-court declaration of the husband? As seen, the chancellor ruled that it was inadmissible under "the well-established rule that a parent (except in rare circumstances not present here), is not competent to testify so as to bastardize a child born in wedlock." The court very evidently had reference to Lord Mansfield's rule, stated in *Goodright* v. *Moss,* 2 Cowp. 591, 11 Eng. Rul. Cas. 518

(K.B. 1777). In *McMillan* v. *Peters,* 30 Haw. 574, 583-84, the court said it had been held many times that "neither the mother, her husband nor her paramour is competent to testify against the child's legitimacy." However, declarations of the paramour, who was alleged by the plaintiff to be her father, were ruled admissible in evidence. The decisive point was that the child would not be bastardized whether the mother's husband or the paramour was the father, the mother having married the paramour.[23] Furthermore, there was independent evidence that at the time of the child's conception the mother for many years had been separated from her husband, was cohabiting with the paramour, and went everywhere with him; and that from the inception of their cohabitation they never separated.

In *Godfrey* v. *Rowland,* 17 Haw. 577, which was an appeal after the new trial ordered in the earlier case, 16 Haw. 377, *supra,* it was indicated that it was error to permit the wife to testify to nonintercourse with her husband after they were separated, but whether this was so because of lack of corroboration of the wife,[24] or because of adoption of Lord Mansfield's rule, is not clear, and in any event the supposed error was held to be harmless— this was because the ejectment suit could be successfully maintained even if intercourse occurred after the separation and the two sons born to the wife after the separation were legitimate and were tenants-in-common with the son represented by plaintiff.

Upon review of the cases, the adoption of Lord Mans-

---

[23] See R.L.H. 1955, § 57-24. A similar provision was contained in R.L.H. 1925, § 3043, referred to in *McMillan.*

[24] The court referred to *The King* v. *Luffe,* 8 East 193, and stated that "in several American cases the evidence appears to have been admitted 'when corroborated by other evidence,' but whether sufficient in itself, or only when corroborated, to prove non-access, is not quite clear." *Cf., Wilson* v. *Wilson,* 174 Ky. 771, 193 S.W. 7, 10.

field's rule in this jurisdiction must be regarded as an open matter. We do not find it necessary to resolve the point in this case. Nor do we find it necessary to resolve the further question whether the declaration in Harvey Murray's will was unaffected by the *ante litem motam* requirement. We conclude that the mere out-of-court declaration of the husband denying paternity, not subject to cross-examination and not corroborated, if admissible could not be deemed to constitute the "clear and convincing evidence"[25] required to rebut the presumption of legitimacy arising from birth in wedlock.

Affirmed.

*J. Garner Anthony* (*John H. R. Plews* with him on the brief, *Robertson, Castle & Anthony* of counsel) for appellant Cecily Cunha.

*Earl S. Robinson* (*Thomas W. LeSage* of Pasadena, California and *Culver Van Buren* of Burbank, California with him on the brief, *Fong, Miho, Choy & Robinson* of counsel) for Harve David Murray and Carma Rae Murray Orr, appellees.

*Thomas W. Flynn,* guardian ad litem for Donna Patricia Murray, appellee, *pro se.*

*R. G. Dodge,* attorney for May Cunha Ross, Richard Earl Cunha, and Ernest Alexander Ross, guardian of Peter Alexander Ross, Bernice May Ross, Richard Dale Cunha, John Michael Cunha, Kathryn Ann Cunha and Anthony Lynn Cunha, appearing individually and as a class representing all other persons, including unborn persons, who may hereafter claim to be entitled to income, joined in the arguments set forth in appellant Cecily Cunha's brief.

*C. A. Gregory* (*Smith, Wild, Beebe & Cades* of counsel), for the trustee, appellee, appeared but did not argue.

---

[25] *In re Ho Chang Shee's Heirs,* 48 Haw. 193, 397 P.2d 552, *rehearing denied,* 48 Haw. 391, 402 P.2d 678.

I concur in the opinion of the court except for the intimation that surrounding circumstances may be looked to, to rebut the presumption as to the meaning of the word "issue," the presumption being that the testator was in agreement with the policy of the law as to adopted children being treated the same as natural children.

This court in *Estate of Farrington*, 42 Haw. 640, 660, said that "had the testator not desired our courts to follow the unbroken decisions of many years holding adopted children as 'children' or 'issue' of the adopting parents, he could have avoided this by specifically limiting the income or remainder to issue of the blood."

By case law and public policy, adopted children in this State are "children" or "issue" of the adopting parents unless the testator otherwise declares in his will, and surrounding circumstances may not be looked to in interpreting the instrument on this point.