77 P.3d 940

STATE of Hawai'i, Petitioner–
Plaintiff–Appellee,

v.

Peter MOSES, Respondent–
Defendant–Appellant.

No. 23038.

Supreme Court of Hawai'i.

Sept. 24, 2003.

Reconsideration Denied Oct. 23, 2003.

James M. Anderson, deputy prosecuting attorney, on the briefs, for the petitioner-plaintiff-appellee State of Hawai'i.

Deborah L. Kim, deputy public defender, on the briefs, for the respondent-defendant-appellant Peter Moses.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Petitioner-plaintiff-appellee State of Hawai'i [hereinafter, "the prosecution"] applied for a writ of certiorari to review the Intermediate Court of Appeals' (ICA's) published opinion in *State v. Moses*, No. 23038, 103 Hawai'i 111, 80 P.3d 1, 2002 WL 31375697 (Haw.App. Oct. 22, 2002), in which the ICA vacated the circuit court's judgment and remanded for a new trial. The ICA concluded that, during Moses's trial on nine counts, the circuit court abused its discretion in admitting into evidence a toxicology report showing that Moses had ingested cocaine. The ICA vacated the circuit court's judgment on Counts I through VII and remanded for a new trial; the ICA affirmed Moses's conviction on Count VIII (unauthorized entry into motor vehicle) because Moses conceded the charge (such that the failure to suppress the drug test evidence did not contribute to Moses's conviction). The circuit court dismissed

Count IX (attempted unauthorized control of propelled vehicle): the jury announced that it was deadlocked on that count, and the circuit court granted the prosecution's motion for *nolle prosequi.*

The ICA held that Moses's toxicology report was a privileged physician-patient communication under Rule 504 of the Hawai'i Rules of Evidence (HRE)[1] and was therefore inadmissible. The ICA held that admission of this evidence was not harmless error because the evidence went to Moses's credibility and state of mind. Furthermore, the ICA held that the record was inadequate to determine whether Moses waived the privilege by voluntarily disclosing his medical records to the prosecution. Therefore, the ICA vacated the judgment of the circuit court (with the exception of Count VIII, which Moses conceded) and remanded for a new trial.

In its application for a writ of certiorari, the prosecution contends that the ICA gravely erred in not holding that Moses had waived his physician-patient privilege. In support of its contention that Moses waived his privilege, the prosecution asks this court to take judicial notice of certain documents not in the circuit court record. In the alternative, the prosecution contends that the ICA erred in not remanding the case to the circuit court for an evidentiary hearing on whether Moses waived his privilege.

In his response in opposition to the prosecution's application, Moses argues that this court should not consider the prosecution's

1. HRE Rule 504 (1993) provides in relevant part:
    **Rule 504   Physician-patient privilege.** (a) Definitions. As used in this rule:
    (1) A "patient" is a person who consults or is examined or interviewed by a physician.
    (2) A "physician" is a person authorized, or reasonably believed by the patient to be authorized, to practice medicine in any state or nation.
    (3) A communication is "confidential" if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician, including members of the patient's family.

    (b) General rule of privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition, including alcohol or drug addiction, among oneself, the patient's physician, and persons who are participating in the diagnosis or treatment under the direction of the physician, including members of the patient's family.

    (c) Who may claim the privilege. The privilege may be claimed by the patient, the patient's guardian or conservator, or the personal representative of a deceased patient. The person who was the physician at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the patient....

"privilege waiver" argument, inasmuch as the prosecution raised this issue for the first time on appeal.

We hold that the ICA gravely erred in failing to remand this case to the circuit court for an evidentiary hearing on whether Moses did, in fact, waive his physician-patient privilege. Although the prosecution did not raise the issue of waiver until oral argument before the ICA, the prosecution's failure to raise the argument is excusable based on the circuit court's determination that there was no privilege; in other words, the prosecution had no reason to argue to the circuit court that the privilege had been waived when the court determined that there was no privilege to be waived. Therefore, we vacate the opinion of the ICA insofar as it remanded this case for a new trial on Counts I through VII; we affirm the opinion of the ICA insofar as it vacated the judgment and sentence of the circuit court as to Counts I through VII and affirmed the judgment and sentence of the circuit court as to Count VIII; and we remand this case to the circuit court for an evidentiary hearing to determine whether Moses waived his privilege. If the circuit court concludes that Moses did not waive his privilege, then the circuit court should proceed to a new trial; if the court finds that Moses did waive his privilege, then the circuit court should enter a new judgment reinstating Moses's convictions.

## I. BACKGROUND

### A. Factual Background

On September 11, 1998, Moses broke into a parked car (a white Pontiac Grand Am) along the Makapuʻu Lighthouse access road. Honolulu Police Department (HPD) Officer Earl Haskell was checking the area when a bicyclist notified him that someone was breaking into a car nearby. Officer Haskell drove his marked police car to where the break-in was occurring; he saw Moses in the parked car and called HPD Officers John Veneri and Laura Chong for backup. Officer Haskell got out of his car, at which point Moses approached Officer Haskell and told him that the white Grand Am belonged to Moses's family. Officer Haskell testified that Moses's eyes appeared glassy and red and that Moses was not blinking; he also testified that these are signs of drug ingestion (specifically, "ice" or crystal methamphetamine ingestion). During his testimony, Moses denied that he was on drugs at the time of the break-in.

Officer Haskell took Moses's personal information, at which point Moses confessed to having broken into the car. When Officers Veneri and Chong arrived on the scene, Moses approached the two officers; Moses testified that he wanted to confess to the two officers outside the presence of Officer Haskell in the hope that his confession would convince Officers Veneri and Chong to let him go without arrest. Officer Chong grabbed Moses and made him sit down on a pillar in front of the Pontiac Grand Am.

At this point, the officers' and the Defendant's stories diverge.

Officer Veneri testified that Officer Haskell took out his handcuffs and that Moses "stood up as though he were anticipating to be handcuffed." Officer Veneri stated that Officer Haskell reached for Moses's arm and that Moses pulled away, at which point Officers Chong and Veneri both reached for Moses's arms. Officer Veneri testified that Moses then threw Officers Chong and Veneri to the side; Officer Veneri grabbed Moses by the hair to try to get him to the ground and tried to take Moses's legs out from underneath him. Moses kneed Officer Veneri in the groin and stomach area. Officer Veneri continued to pull on Moses's hair, and Moses fell forward; as he fell, Moses grabbed Officer Veneri around the waist and grabbed Officer Veneri's weapon. Officer Veneri testified that he tried to hold onto his weapon using his elbow, but Moses kneed him in the stomach again, and Moses, Officer Veneri, and Officer Haskell all fell backwards. Officer Veneri stated that his gun came out of its holster, and he next saw the gun in Moses's right hand.

Office Haskell testified that he was knocked over and ended up leaning over Moses's legs; he pulled himself up and saw Moses turn around to face him. Officer Haskell testified that Moses looked at him and said, "Come on, you fucker, come on." Offi-

cer Haskell heard the gun go off, and he fell to the ground. Officer Haskell stated that Moses then pointed the gun at Officer Haskell's head and kept saying, "Come on, you fucker, come on."

Officer Veneri testified that he heard (but did not see) the first shot go off and saw Officer Haskell in a semi-prone position. Officer Veneri yelled, "Gun," at which point Moses turned around and pointed the gun at Officers Veneri and Chong. Moses ran across the street and crouched behind the driver's door of Officer Haskell's police car. Officer Veneri then took Officer Chong's gun and instructed her to take care of Officer Haskell. Officer Veneri yelled out at Moses to drop the gun, at which point Moses leaned out from behind the door, pointed the gun in Officer Veneri's direction, and fired a shot. Officer Veneri fired sixteen rounds at Moses and reloaded his gun. Moses pointed the gun at Officer Veneri again, and Officer Veneri fired at Moses; this happened two more times, at which point Officer Veneri ran out of ammunition again. Officer Veneri testified that Moses pointed the gun at him a total of five times. After Officer Veneri reloaded a second time, he observed Moses crawl out of the police car and "flop on the ground alongside the vehicle." Officer Veneri approached Moses and asked him where the gun was; Moses then reached under his body and pushed the gun out from underneath him.

Moses gave a different version of the events that occurred after Officer Chong had Moses sit on the pillar. Moses testified that, after sitting for a few moments, Officer Chong had Moses stand up again. Moses testified that Officer Haskell grabbed his wrist and bent it behind him. This was painful to Moses, and he pulled his hand away—Moses stated that he was not trying to hurt anyone. All three officers then tried to get Moses's hands behind his back, and Moses testified that Officer Veneri grabbed Moses's hair and pulled him down. Moses stated that he tried to brace his fall and in so doing "[went] by" Officer Veneri's waist. The three officers continued to try to push Moses down. Moses stated that he then saw a gun on the ground in front of his foot, after

which he lost his balance and fell down. When he got up, he picked up the gun; Moses testified that he did not know why he picked up the gun. Officer Haskell tried to grab Moses's arms, at which point Moses still had the gun in his right hand. Officer Haskell had to step over the pillar to reach Moses and, in so doing, ended up behind and below Moses. Moses testified that he and Officer Haskell fell backwards, with Officer Haskell still holding Moses's hands. During the fall, Moses heard a shot go off; he testified that he did not know who pulled the trigger, but that the gun was in Moses's right hand during the fall and Officer Haskell had his hand on Moses's right hand during the fall. Moses also testified that the gun fired a second shot as he tried to get up off the ground: he used his right hand and the gun to brace himself as he turned over, at which point he saw "dirt fly." He testified that he had no intent to use the gun to hurt anyone or to protect himself and that he had never fired a gun before.

Moses testified that he ran across the street because he was scared and that he headed towards the police car because it was the first thing he saw. He stated he did not realize he still had the gun in his hand. Moses was shot while getting into the police car and was shot several more times while looking up to see whether the police officers would stop shooting. Moses opened the door to the police car, dropped the gun on the ground, and pushed himself out of the car. Moses ended up lying on the ground on top of the gun; when Officer Veneri approached him and asked where the gun was, Moses shoved it out from underneath him.

Moses was taken to Queen's Medical Center and arrived in stable condition. Steven Nishida, M.D., attended to Moses, ordering a standard toxicology report as part of his patient evaluation. Dr. Nishida testified that, in situations such as this, the toxicology report serves two purposes: first, it aids in his evaluation of the patient's mental status (*i.e.*, it informs him whether the patient's confusion is due to the head injury alone or due to drugs and/or alcohol); second, to some degree, the report prevents harmful drug interaction conditions. The toxicology report

showed that Moses tested positive for cocaine.

## B. *Procedural Background*

Moses was charged by indictment on nine counts, including attempted murder, terroristic threatening, escape, theft, place to keep pistol or revolver, unauthorized entry into motor vehicle, and attempted unauthorized control of propelled vehicle. Shortly before trial, the prosecution filed a motion in limine asking the circuit court for an order allowing the prosecution to introduce the toxicology report as evidence that Moses tested positive for cocaine. At the hearing on the motion, the circuit court held that (1) the probative value of the evidence outweighed any prejudice to Moses, and (2) the toxicology report was not a confidential physician-patient communication. At no point did the prosecution argue in the alternative that, should the court find the toxicology report to be privileged, the evidence would be admissible because Moses had waived his privilege.

Moses was tried before a jury and found guilty on eight counts. The jury was "hopelessly deadlocked" on Count IX; the prosecution thereafter moved for *nolle prosequi* of Moses as to Count IX, and the court granted this motion. Moses moved for a new trial, and the circuit court denied the motion.

## C. *Appellate History*

Moses timely appealed, arguing, *inter alia*, that the circuit court erred by admitting Moses's toxicology report because the report was a privileged physician-patient communication. The prosecution filed an answering brief, but did not make the alternative argument in its brief that, even if Moses's toxicology report was privileged, Moses had waived that privilege. The first time the prosecution argued that Moses had waived his privilege was during oral argument before the ICA: the prosecution argued that even if the toxicology report was privileged, Moses had waived the privilege by having voluntarily provided the report to the prosecution.

The ICA held that Moses's toxicology report was a privileged physician-patient communication; the ICA vacated the circuit court's judgment and remanded for a new trial with respect to Counts I through VII. The ICA affirmed Moses's conviction as to Count VIII (unauthorized entry into motor vehicle), because admission of the toxicology report did not weigh against Moses on this count. The ICA expressly declined to consider the prosecution's argument that Moses had waived his physician-patient privilege, explaining that "[t]his issue was not raised and addressed in the circuit court. The record before us is inadequate to address this issue for the first time on appeal."

The ICA also did not consider Moses's other grounds for appeal, and Moses timely filed a motion for reconsideration requesting that the ICA rule on these other grounds. The ICA denied Moses's motion for reconsideration. Moses applied for writ of certiorari, but we did not grant certiorari on Moses's petition.

The prosecution applied for a writ of certiorari from the ICA's ruling, and we granted certiorari. In its application, the prosecution argues that Moses waived the physician-patient privilege when he voluntarily disclosed his medical records to the prosecution, such that this court should reverse the ICA's opinion. The prosecution's alternative prayer is for this court to remand the case to the circuit court for an evidentiary hearing on whether Moses voluntarily waived his privilege.

## II. *STANDARD OF REVIEW*

In granting a writ of certiorari, this court reviews decisions for "(1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the [ICA] with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal." Hawai'i Revised Statutes (HRS) § 602–59(b) (1993).

## III. *DISCUSSION*

A. *The ICA did not err in holding that Moses's toxicology report was a privileged physician-patient communication.*

■ The ICA's ruling that Moses's toxicology report was a privileged physician-patient

communication was not erroneous. The ICA thoroughly researched and analyzed the issue of whether a criminal defendant's toxicology report should be considered a confidential physician-patient communication: the ICA examined the text, commentary, and legislative history of Hawai'i Rules of Evidence (HRE) Rule 504, as well as this court's discussion of the physician-patient privilege in *Dubin v. Wakuzawa*, 89 Hawai'i 188, 970 P.2d 496 (1998), in reaching its conclusion. The ICA looked to thirteen other states [2] to determine whether Moses's toxicology report should be privileged and concluded that "[a] privilege that would exclude the results of physical examinations and diagnostic tests is almost no privilege at all. It is not for us to vitiate the physician-patient privilege, but to apply the privilege consistent with its stated purpose." Therefore, we decline to overturn the ICA's holding that Moses's toxicology report was a privileged physician-patient communication.

■ Similarly, we find no error in the ICA's determination that admission of Moses's toxicology report into evidence was not harmless beyond a reasonable doubt. *See State v. Gano*, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999). As the ICA explained:

> Moses's convictions resulted from the jury believing the testimony of the three police officers as opposed to Moses's testimony. There was a reasonable possibility that the evidence that Moses had tested positive for cocaine may have weighed against Moses and, therefore, contributed to his conviction of all charges except Count VIII ... which Moses conceded.

B. *Whether Moses waived his physician-patient privilege is a factual question to be decided by the circuit court in an evidentiary hearing on remand.*

The prosecution contends that the ICA erred by holding that the record was inadequate to determine that Moses waived his physician-patient privilege. Moses, on the other hand, contends that this court should decline to consider whether he waived the privilege as the waiver argument was raised for the first time on appeal. We reject both contentions.

1. **The record does not support the prosecution's argument that Moses waived his physician-patient privilege.**

■ The prosecution asks this court to take judicial notice of two documents outside the record; the prosecution argues that these two documents clearly show that Moses voluntarily disclosed his toxicology report and thereby waived his physician-patient privilege. We decline to take judicial notice of these documents.

■ HRE Rule 201 provides in relevant part that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." HRE Rule 201(b). As this court stated in *In re Estate of Herbert*, 90 Hawai'i 443, 466, 979 P.2d 39, 62 (1999), "the purpose of the judicial notice rule, and it would appear to be a wholesome one, is to eliminate the necessity of taking the time of the court and jury to make formal proof of a fact which cannot be disputed" (citations omitted) (block quote format omitted).

The prosecution asks this court to take judicial notice of the following: (1) a letter, sent by the Public Defender's (Moses's counsel's) office to Queen's Medical Center and dated October 5, 1998, requesting all of Moses's medical records, "including any records relating to any blood or urine samples taken and analyzed for the presence of alcohol or drugs," and (2) a letter sent by a secretary in the Public Defender's office to the deputy prosecuting attorney, dated October 20, 1998, which notes the enclosure of "a copy of the medical records for the defendant in the above-mentioned case." The prosecution also points to one item in the record: a statement made by the deputy public defender in a circuit court discovery hearing on

2. The ICA examined opinions by state courts in Arizona, California, Illinois, Indiana, Iowa, Kansas, Louisiana, Nebraska, New Hampshire, New York, North Dakota, Texas, and Washington.

March 23, 1999 that "[w]e have provided [the deputy prosecuting attorney] previously with the defendant's medical records so that those didn't have to be subpoenaed and compelled." The prosecution argues that this statement shows Moses's intent to disclose his toxicology report to the prosecution and that the letters show that the toxicology report was intentionally disclosed to the prosecution. Therefore, the prosecution argues, Moses waived the physician-patient privilege.

We disagree and hold that judicial notice is inappropriate in this case. As the prosecution admits, neither letter sent by the Public Defender's office is contained in the record on appeal. This court cannot consider evidence outside the record: "[e]very appeal shall be taken on the record and no new evidence shall be introduced in the supreme court." HRS § 641–2 (1993). Insofar as the prosecution argues that the ICA gravely erred by holding that the record was inadequate to hold Moses waived the physician-patient privilege, the prosecution's argument is without merit. We reject the prosecution's attempt to use the judicial notice doctrine to circumvent HRS § 641–2. HRE Rule 201 limits judicial notice to adjudicative facts "not subject to reasonable dispute," meaning that the fact must be commonly known or easily verifiable. See, e.g., State v. Vliet, 95 Hawai'i 94, 112, 19 P.3d 42, 60 (2001) (taking judicial notice "that Widmark's formula is widely viewed as reliable"); State v. Puaoi, 78 Hawai'i 185, 190, 891 P.2d 272, 277 (1995) (noting that "appellate courts may take judicial notice of venue, provided that the requirements of HRE 201(b) are met"); Almeida v. Correa, 51 Haw. 594, 465 P.2d 564, 571–72 (1970) (taking judicial notice that an average pregnancy lasts approximately nine calendar months but that there are many individual variations in pregnancy length). See also 9 John Henry Wigmore, Evidence in Trials at Common Law § 2566, at 711 (Chadbourn rev.1981) (describing judicial notice as "the acceptance of a matter as proved without requiring the party to offer evidence of it").

A court should take judicial notice only in very limited circumstances:

The scope of facts that may be noticed includes:

(1) Matters which are actually so notorious to all that the production of evidence would be unnecessary;

(2) Matters which the judicial function supposes the judge to be acquainted with, in theory at least;

(3) Sundry matters . . . capable of such instant and unquestionable demonstration . . . that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary.

9 John Henry Wigmore, Evidence in Trials at Common Law § 2571, at 732 (Chadbourn rev.1981). Judicial notice of the contents of communications between parties is inappropriate because such communications differ from case to case; these are not the types of facts that are "generally known with certainty by all the reasonably intelligent people in the community [or] capable of accurate and ready determination by resort to sources of indisputable accuracy." 2 John W. Strong et al., McCormick on Evidence § 328, at 369 (5th ed.1999). Therefore, we decline the prosecution's request to take judicial notice of these additional documents.

While the deputy public defender's statement to the circuit court is in the record, we affirm the ICA's conclusion that this statement, without more, is insufficient to hold that Moses voluntarily waived his physician-patient privilege. The statement does not satisfy the requirements of HRE Rule 511 [3]: it does not prove that the toxicology report was actually disclosed, nor does it prove that the disclosure was voluntary. We therefore find no grave error in the ICA's determination on this point.

**2. The issue of whether Moses waived his physician-patient privilege is properly considered by this court.**

Moses contends that this court should decline to consider the prosecution's

3. HRE Rule 511 provides:
   **Waiver of privilege by voluntary disclosure.** A person upon whom these rules confer a privilege against disclosure waives the privilege if, while holder of the privilege, the person or the person's predecessor voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is a privileged communication.

waiver argument, inasmuch as it was raised for the first time on appeal in oral argument before the ICA. As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases. *See State v. Ildefonso*, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992) ("Our review of the record reveals that [the defendant] did not raise this argument at trial, and thus it is deemed to have been waived."); *State v. Hoglund*, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal."); *Association of Apartment Owners of Wailea Elua v. Wailea Resort Co., Ltd.*, 100 Hawai'i 97, 107, 58 P.3d 608, 618 (2002) ("Legal issues not raised in the trial court are ordinarily deemed waived on appeal.").

■ However, this rule is not absolute. First, the prosecution is the appellee and therefore does not have the burden of proving that the trial court erred. *See, e.g., Territory v. Kobayashi*, 25 Haw. 762, 766 (1921) ("We necessarily approach a case with the assumption that no error has been committed upon the trial and until this assumption has been overcome by a positive showing the prevailing party is entitled to an affirmance."). *See also* Hawai'i Rules of Appellate Procedure, Rules 28(b)(7) and 28(c) (1998) (requiring that the appellant's opening brief provide a detailed outline of all arguments on appeal, but only requiring the appellee's answering brief to respond to those points from appellant's brief that are controverted on appeal). The general rule prohibiting new arguments on appeal prevents appellants from presenting new legal theories as to why they should have prevailed at trial. In this case, however, the party raising the new argument is the appellee; rather than

making a new argument as to why it is entitled to relief, the prosecution is instead putting forth additional reasons why the circuit court's ruling was correct. Consideration of the appellee's argument in this situation is appropriate, even though not raised before the circuit court, because the appellee never had the need to raise such an argument before the circuit court: the prosecution never needed to argue that Moses had waived his physician-patient privilege because the circuit court rejected Moses's contention that the report was privileged.[4] Had the circuit court ruled that the report was privileged, and had the prosecution thereafter failed to argue waiver, this court would not allow the prosecution to raise this argument on appeal. However, because the prosecution had no need to raise this argument in the circuit court, this court will not bar the prosecution from raising the issue on appeal.

■ Second, this court will consider new arguments on appeal where justice so requires. For example, in *Fujioka v. Kam*, 55 Haw. 7, 514 P.2d 568 (1973), this court agreed to consider an argument, not raised in the circuit court, that a statute was unconstitutional:

It is the general rule that an appellate court should only reverse a judgment of a trial court on the legal theory presented by the appellant in the trial court .... However, we have also said that the rule is not inflexible and that an appellate court may deviate and hear new legal arguments when justice requires. We also stated that in the exercise of this discretion an appellate court should determine whether the consideration of the issue requires additional facts, whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and

---

4. At the hearing on the prosecution's motion in limine on the admissibility of the toxicology report, the prosecution argued that the toxicology report was admissible because it was more probative than prejudicial (specifically, that evidence of cocaine use would explain the police officer's testimony on Moses's appearance and behavior). Moses argued (1) that the toxicology report was a privileged physician-patient communication and (2) that the evidence of cocaine use was more prejudicial than probative. The prosecution did not argue in rebuttal, but did inform the court that the evidence went to Moses's state of mind and to his conduct. The court then ruled that the probative value of the toxicology report outweighed any prejudice and that the physician-patient privilege did not apply because Moses made no "statement" that would trigger the privilege.

whether the question is of great public import.

55 Haw. at 9, 514 P.2d at 570 (internal citations omitted). *Fujioka* was a civil case, but the analysis is the same in criminal cases. *See State v. Ildefonso,* 72 Haw. at 584–85, 827 P.2d at 655 (1992) (declining to hear a constitutional challenge not raised before the circuit court, but recognizing that this court has addressed issues raised for the first time on appeal where "the constitutionality of the statute is of great public import and justice required that we consider the issue"). Again, given that the prosecution had no need to raise this argument before the circuit court, this court will not bar the prosecution from raising the issue on appeal.

C. *A remand to the circuit court for an evidentiary hearing is proper in this case.*

Having concluded that judicial notice of documents outside the record is not appropriate and that this court may properly consider the issue of waiver, we believe that two questions must be answered in order to resolve the issue of waiver of the physician-patient privilege in this case: (1) whether Moses's toxicology report was furnished to the prosecution by counsel for Moses; and (2) assuming the toxicology report was furnished to the prosecution, did Moses "voluntarily disclose[ ] or consent[ ] to disclosure" of the toxicology report? HRE Rule 511. These questions should properly be decided by the circuit court in an evidentiary hearing on remand.

IV. *CONCLUSION*

Based on the foregoing, we affirm the ICA's holding insofar as it vacated the judgment of the circuit court on Counts I through VII. However, rather than remanding for a new trial, we remand for an evidentiary hearing to determine whether Moses voluntarily waived his physician-patient privilege. If the circuit court concludes that Moses did not waive his privilege, then he shall be entitled to a new trial on all counts (with the exception of Count VIII, unauthorized entry into motor vehicle, and Count IX, attempted unauthorized control of propelled vehicle). If the circuit court concludes that Moses waived

his privilege, then the circuit court shall enter a new judgment reinstating his convictions.